Kenneth B. FRAZIER, a Minor, By and Through Kenneth L. FRAZIER, his Guardian Ad Litem, and Kenneth L. Frazier, Individually, Plaintiffs and Appellants,

v.

Mark NORTON, a Minor, By and Through Melvin T. NORTON, his Guardian Ad Litem, Defendant and Appellee.

No. 13793.

Supreme Court of South Dakota.

Argued Feb. 17, 1983.

Decided June 15, 1983.

Rehearing Denied July 12, 1983.

Franklin J. Wallahan and Lonnie F. Bryan of Wallahan Law Offices, Rapid City, for plaintiffs and appellants.

David E. Morrill of Morrill, Hansen, Hubbard & Brown, Rapid City, for defendant and appellee; Portia K. Brown of Morrill, Hansen, Hubbard & Brown, Rapid City, on brief.

HENDERSON, Justice.

## ACTION

Kenneth L. Frazier as guardian ad litem for his son Kenneth B. Frazier, and Kenneth L. Frazier individually (appellants), filed a complaint against Mark Norton individually (appellee) for $800,000.00 damages due to severe hip injuries allegedly caused by Mark pushing Ken down. Melvin T. Norton acted as guardian ad litem for his son Mark Norton. Appellee affirmatively alleged that appellants were either contributorily negligent or had assumed the risk of injury. After a jury trial, a verdict was returned on February 26, 1982, in favor of appellee. Judgment was entered on March 5, 1982. Appellants motioned to set aside the verdict and for a new trial. On April 8, 1982, appellants' motions were denied by order of the trial court. Appellants have appealed from this denial and the final judgment. We affirm.

## FACTS

Considerable dispute revolves around the facts herein. Appellant Kenneth L. Frazier and his adopted son appellant Kenneth B. Frazier (Ken), were neighbors in Hot Springs, South Dakota, with appellee Melvin T. Norton, and his son appellee Mark Norton (Mark). Ken and Mark were childhood friends. Sometime during March 1977, Ken, then age thirteen, injured himself during junior high school track practice. Ken's coach advised Ken that he had pulled a hamstring muscle. Although the injury caused Ken to discontinue track and miss some school, Ken's parents did not seek the advice of a physician. Ken's injury continued to bother him up to and including the date of April 22, 1977, when he was admitted to a Hot Springs, South Dakota hospital following a fall. Appellees asserted that Ken's March injury was a chronic slip of his left hip. Appellants countered the March injury was a pulled hamstring muscle which was unassociated with Ken's hip. Physicians testified that Ken's March injury could have been either a chronic slip or a hamstring injury.

On April 22, 1977, Ken, Mark, and some friends attended a school-related event at Case Auditorium in Hot Springs. After the event, Ken, Mark, age fourteen, Gary Frazier, age twelve, Jeff Wortham, age thirteen, and Danny Le Lacheur, age nine, waited for rides home outside of the auditorium. Danny went home. Gary, Jeff, and Mark commenced a game called "Smear the Queer," which had the object of tackling the other boys until one survivor remained standing. Mark, the most agile of the boys, testified that he had noticed Ken limping the entire day. Therefore, Mark told Ken that he had better not play "Smear the Queer." Ken testified that he abstained from the game.

Ken testified that as the game progressed, Mark walked over to where Ken was standing and, without warning, shoved and

tripped Ken. Mark testified that he was playing the game and had his arms around Gary Frazier, Ken's little brother, when Ken grabbed Mark from behind. Mark contends that he jarred himself loose and then noticed Ken on the ground. There were no eyewitnesses to Ken's fall. All witnesses agreed that they could not say Ken was playing "Smear the Queer" before the incidents leading to his tragic fall.

Immediately upon falling, Ken was in pain. Mrs. Wortham, who was to drive the boys home, took Ken to the emergency room at the hospital in Hot Springs. Ken was admitted to the hospital as an inpatient the next day and after several days' treatment by his family physician, Ken was transported to Rapid City Regional Hospital for a surgical implantation of pins and screws in his hip. Ken's initial surgery was unsuccessful and a second surgery was required. After his surgery, Ken's condition progressively deteriorated, and he ultimately was admitted to the Crippled Children's Hospital in Minneapolis for several more surgeries, resulting in a total hip fusion.

## ISSUES

### I.

WERE INCONSISTENCIES IN THE TESTIMONY OF DEFENSE WITNESSES SO CONSEQUENTIAL THAT A FAILURE TO PROVIDE A JURY INSTRUCTION ON PRIOR INCONSISTENT STATEMENTS WAS REVERSIBLE ERROR?

### II.

DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR BY INSTRUCTING THE JURY ON APPELLEE'S AFFIRMATIVE DEFENSES OF CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF THE RISK?

### III.

DID THE TRIAL COURT PROPERLY INSTRUCT THE JURY ON THE APPLICABLE STANDARD OF CARE?

## DECISION

### I.

During the settlement of instructions, appellants requested a stock jury instruction on prior inconsistent statements taken from South Dakota Pattern Jury Instruction (Civil) § 3.01:

The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement or acted in a manner inconsistent with his or her testimony in this case on a matter material to the issues. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness.

This instruction was rejected by the trial court in favor of the following general instruction:

You are the sole and exclusive judges of all questions of fact and the credibility of the witnesses and the weight to be given the testimony of each of them.

In determining the credit to be given any witness, you may take into account the witness' ability and opportunity to observe or remember, the witness' manner while testifying, any interest, bias or prejudice the witness may have, and the reasonableness of the witness' testimony considered in the light of all the evidence in the case.

Additionally, the trial court provided the falsus in uno, falsus in omnibus instruction:

If you believe that any witness testifying in this case has knowingly sworn falsely to any material matter in this case, then you may reject all of the testimony of the witness.

Appellants contend our recent holding in *State v. Grey Owl,* 295 N.W.2d 748 (S.D. 1980), establishes the trial court committed reversible error in failing to give the requested instruction. In *Grey Owl,* this Court held that where the State's prime witness makes a prior inconsistent statement going to the heart of the case, and

having a crucial impact, it is error to refuse an instruction for the jury on impeachment of the witness.

According to appellants, the impeached witnesses were Jeff Wortham and Mark Norton. On direct examination, Jeff testified:

Q. Okay, Now, just tell me what happened.

A. Well, we started running around and knocking each other down and stuff.

Q. Who?

A. Me, Ken, Gary, and Mark.

On cross-examination, Jeff testified:

Q. So you are not saying [Ken] was playing; you are not saying [Ken] wasn't playing. You are just saying you don't remember either way; is that right?

A. Yes.

Q. So when you earlier testified when Mr. Morrill was asking you questions and you said that you boys left, and he asked you who left, and you said, "Mark, Gary, Ken and me," and then he asked you who played and you said, "Mark, Gary, Ken and me." You are not meaning to say that Ken was really playing with you and Gary and Mark; you are really—to be accurate, you are saying you don't remember whether Ken was or was not playing with you; is that correct?

A. I just remember he was with us when we went outside.

Q. But you don't remember his playing with you, do you?

A. No.

As to how Ken fell, the following colloquy took place while Jeff was being cross-examined:

Q. And as you last looked up and saw him before he was injured, isn't it true that you saw Mark standing by him, face to face?

A. Yes.

Q. And isn't it true also that the last thing you saw before you saw Ken laying on the ground with his badly injured hip was Mark, face to face, pushing him with his hands; isn't that true?

A. No, I didn't see him push him.

Appellants' counsel then attempted impeachment by reading a portion of a deposition of Jeff, including:

Question: Okay. What is the first thing you do remember about him falling?

Answer: Well, I remember that I saw him and Mark Norton together. I was standing about five feet away at the time, and I believe—I don't know what happened. I just saw Ken fall down. Mark just shoved him or done something. I don't know.

On redirect examination, Jeff then testified:

Q. Jeff, did you actually see Mark shove Ken?

A. No.

Q. Now, in your deposition, you said something about a shove. Would you explain to the jury why you mentioned a shove when you took the deposition?

A. Well, I seen him standing there, and then I seen him laying on the ground, so I assumed he had been shoved or knocked down.

Q. It was an assumption then?

A. Yes.

As for Mark, appellants assert that on cross-examination Mark admitted saying in a prior deposition he tripped Ken. The actual cross-examination exchange was:

Q. Well, instead of just bumping with your shoulder, you really did push him, didn't you?

A. No, sir.

Q. But you didn't push him on purpose, did you?

MR. MORRILL: Objected to as a misstatement of the record. Assuming facts not in evidence.

THE COURT: Sustained.

\* \* \* \* \* \*

Q. (by Mr. Wallahan) I asked substantially the same things, did I not? Do you remember that?

A. Pretty much so.

Q. Didn't I ask you this question and did you give this answer?

MR. MORRILL: What page?

MR. WALLAHAN: 16, line 21.

Q. (by Mr. Wallahan) Do you have a specific recollection that you didn't push him, is that what you're telling me?

"Answer: I didn't push him on purpose because I told him to stay out of the game."

Was that your answer at that time to that question?

A. Yes, sir.

Q. Of course, you understand I am not accusing nor is anyone else accusing you including the Fraziers of pushing him on purpose; you didn't intend to hurt him, did you?

A. I did not push him.

Q. So you were in error when you said a couple years ago that you didn't push him on purpose?

A. It depends on what you classify as pushing. Pushing with your hands, push with your back or with your side.

Q. But you meant to say, I didn't bump my shoulder into him on purpose; is that right?

A. That can be considered a push.

Q. That is what you meant to say then; is that correct?

A. I would say I didn't push. I meant to say I didn't push him.

■ Here, the trial court provided the jury with the falsus in uno, falsus in omnibus instruction, whereas, in *Grey Owl, supra,* no such instruction was given. As we held in *Grey Owl,* 295 N.W.2d at 751: "The burden is on appellant to show not only error but also prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict if appellant's instruction had been given." Although appellants' proposed impeachment instruction may have been beneficial, the testimony of Jeff Wortham and Mark Norton was inconsequentially impeached. Considering the falsus in uno, falsus in omnibus jury instruction, and the general instruction on credibility of witnesses, we find it implausible to assume that the jury would have returned a different verdict had a prior inconsistent statement instruction been given. Under the instructions provided, if the jury disbelieved Mark and Jeff's truth and veracity, it could have disregarded their testimony. It chose not to. Obviously, the jury did not believe that any inconsistent testimony of these boys was significant. We find no crucial impact, such as in *Grey Owl, supra.* We further note that trial counsel, in closing argument, vigorously pursued the inconsistencies that appellant believed existed. On the state of this record, we hold there was no prejudicial error in refusing the instruction.

II.

Appellants ask this court to hold that the trial court committed prejudicial error by instructing the jury on appellee's affirmative defenses of contributory negligence and assumption of risk. The crux of appellants' position is that the evidence adduced at trial was insufficient to raise appellee's defenses.

■ Trial courts can only present those issues to the jury by way of instructions which find support by competent evidence in the record. *Wolf v. Graber,* 303 N.W.2d 364 (S.D.1981). Appellees correctly assert the record does show appellants' failure to seek medical attention for Ken's March injury, Kenneth L. Frazier's failure to restrict Ken's activities after the March injury, Mark's version of Ken's fall, and Ken's awareness of the rough nature of the game "Smear the Queer."

■ A clear factual question was presented by the evidence. Apparently, the jury accepted Mark's version of events culminating in Ken's injury. As the Washington Supreme Court held in *Hellriegel v. Tholl,* 69 Wash.2d 97, 417 P.2d 362, 367 (1966): "Persons who engage in roughhouse horseplay also accept the risk of accidental injuries which result from participation therein." Although the witnesses could not say that Ken was involved in the

game, the game was nearby and there is evidence in the record that Ken grabbed Mark from behind while the game ensued.

After reviewing the record herein, we are persuaded that sufficient evidence was elicited at trial to present appellee's instructions on contributory negligence and assumption of risk to the jury.

### III.

As to the applicable standard of care for both Mark and Ken, the trial court instructed the jury:

> Under the law as applied to the present case, every person is responsible for injury to the person or property of another, caused by such person's want of ordinary care or skill, subject to the defense of contributory negligence. When used in these instructions, negligence means want of such ordinary care or skill. Such want of ordinary care or skill exists when there is a failure to do that which a reasonably prudent person would do or when there is done that which a reasonably prudent person would not do; this in each instance in the same or similar circumstances as existed in connection with the conduct which is under consideration.

and:

> As applied to a minor, ordinary care or skill means that degree of care or skill which would fairly be anticipated in like circumstances from a reasonably prudent minor of the same age, maturity, experience, and capacity.*

Appellants contend that the trial court should have instructed the jury to hold Mark, age fourteen, to an adult's standard of care, and Ken, age thirteen, to a minor's standard of care. We note the trial court's instructions to the jury held both boys to a minor's standard of care.

▮ Although appellants claim the jury instructions on the applicable standard of care are unclear and confusing, we disagree. *See Wright v. Marzo,* 427 F.2d 907

---

\* Jury Instruction number 19, on contributory negligence also refers to this instruction on

(10th Cir.1970). We review the jury instructions by construing them together and the instructions are not erroneous if when so construed they provide a full and correct statement of the law applicable to the case at bar. *Grey Owl, supra; Mueller v. Mueller,* 88 S.D. 446, 221 N.W.2d 39 (1974); *Dwyer v. Christensen,* 77 S.D. 381, 92 N.W.2d 199 (1958). Here, both boys were held to the correct standard of care. *Alley v. Siepman,* 87 S.D. 670, 214 N.W.2d 7 (1974).

Affirmed.

All the Justices concur.