2001 SD 67

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Daniel Neil CHARLES a/k/a Daniel Heinzelman a/k/a Daniel Ingalls, Defendant and Appellant.**

No. 21526.

Supreme Court of South Dakota.

Argued April 24, 2001.

Decided May 30, 2001.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, SD, Attorneys for plaintiff and appellee.

Timothy J. Rensch and Patrick K. Duffy, Rapid City, SD, Attorneys for defendant and appellant.

MILLER, Chief Justice.

[¶ 1.]  In this appeal, we affirm a conviction of first degree murder and hold that the trial court did not err in denying a motion for judgment of acquittal or in refusing to instruct the jury on mistake of fact.

### FACTS

[¶ 2.]  Daniel Charles, who was fourteen years of age during the summer of 1999, lived on a ranch near Opal, South Dakota with his stepfather, Duane Ingalls. Charles' mother and Ingalls had divorced the previous summer, but Charles returned to live with Ingalls because his mother's job as a truck driver rendered her unable to care for him.  Charles alleged at trial that he loved Ingalls despite the fact that Ingalls often subjected him to physical and verbal abuse.  Charles testified that after abusive incidents he would frequently retreat to his second floor bedroom, and, when he would see Ingalls in the yard, he would aim an unloaded .25–06 caliber rifle at Ingalls' head and dry fire the rifle to relieve his emotions.

[¶ 3.]  On July 23, 1999, Charles awoke at 4:30 a.m. and prepared breakfast.  By 7

a.m. he was in the hayfield about one-half mile from the ranch home. Shortly after he began windrowing, Ingalls arrived and stopped him. Ingalls yelled at him for improper windrowing and "cuffed" him on the side of the head knocking his head into the glass in the door of the tractor. Charles resumed working, finished the windrowing and returned home to prepare lunch.

[¶ 4.] Charles waited in his room for Ingalls to return from the hayfield. When he arrived and was walking up to the home, Charles pointed the .25–06 caliber rifle at Ingalls' head and pulled the trigger. Tragically, the rifle fired instantly killing Ingalls. Charles contends he did not know the rifle was loaded.

[¶ 5.] After shooting and killing Ingalls, Charles dragged the body into the garage, cleaned the blood off the front yard sidewalk with a water hose and telephoned his mother. He convinced her to come to the ranch by telling her that Ingalls had not returned home the previous night. She arrived about 8 p.m., and he then told her there had been an accident and that Ingalls was dead. She immediately called 911.

[¶ 6.] Law enforcement and other authorities arrived and began processing the crime scene. Pertinent to this appeal, the agents collected four bullets from the rifle and carefully placed them in a baggie. These bullets were used in ballistics, residue and other analyses, but they were never checked for fingerprints.

[¶ 7.] Charles told the investigators a fabricated story about fox hunting in the front yard, which led to the accidental discharge of the rifle and the death of Ingalls. Out of concern for his emotional state (and considering his prior suicide attempt and hospitalization in a hospital

psychiatric ward), Charles was taken to the mental unit of Rapid City Regional Hospital for observation. There he roomed with another youth, W.L. W.L. testified at trial that Charles told him: (1) he wanted to kill his stepfather because Ingalls was a "mean guy"; (2) he shot Ingalls from the upstairs window; (3) the police did not suspect him because they thought it was an accident; (4) he had considered other ways of killing his stepfather; (5) he faked being in shock to make himself more believable; (6) he would kill W.L. and his father if W.L. revealed what Charles had told him.

[¶ 8.] Despite Charles' threat, W.L. told law enforcement about his conversation with Charles. Due to the differing stories between Charles and W.L., agents interviewed Charles again. Charles maintained he did not murder Ingalls and that he had lied to W.L. to act tough. Charles' mother attended this interview and ended it when he became emotionally upset. She then spoke with Charles alone. He admitted to his mother that he fabricated the fox hunting story and that actually he thought the rifle was unloaded. His mother relayed this to the agents.

[¶ 9.] Charles was originally charged in juvenile court, but, after a hearing, he was transferred to adult court. We denied his attempted intermediate appeal of that transfer order.* Charles was tried on the charges of first degree murder, second degree murder and first degree manslaughter. The jury convicted him of first degree murder and he was sentenced to life in prison. The trial court denied Charles' post trial motion for judgment of acquittal. Charles appeals.

## STANDARD OF REVIEW

[¶ 10.] When we review a denial of a motion for judgment of acquittal, the

---

* The issue of transfer to adult court has not been raised on this direct appeal.

question is whether there is sufficient evidence, if believed by the jury, from which the jury could find the defendant guilty beyond a reasonable doubt. *State v. Augustine*, 2000 SD 93, ¶ 26, 614 N.W.2d 796, 800 (citations omitted). In this respect, we accept the evidence and the most favorable inferences fairly drawn from that evidence in support of the verdict. *State v. Heftel*, 513 N.W.2d 397, 399 (S.D.1994) (citations omitted). " 'We do not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of an explanation, or weigh the evidence.' " *State v. Karlen*, 1999 SD 12, ¶ 49, 589 N.W.2d 594, 605 (citations omitted).

## DECISION

[¶ 11.] **1. Trial court did not err in denying Charles' motion for judgment of acquittal.**

[¶ 12.] Charles argues that the State destroyed exculpatory evidence when it failed to check the four bullets removed from the murder weapon for fingerprints before conducting other fingerprint destructive tests. He contends that this destruction of evidence constitutes reversible error, denied him a fair trial and deprived him of due process under the South Dakota and Federal Constitution. Furthermore, Charles asserts that the alleged spoliation of this "key" evidence creates an inference or presumption that the evidence would not have supported the charges against the defendant. *State v. Kietzke*, 85 S.D. 502, 515, 186 N.W.2d 551, 558 (1971).

[¶ 13.] In order to prevail, Charles must show prejudicial error. *Kietzke*, 85 S.D. at 515, 186 N.W.2d at 558. This he failed to do. Based on his complaint of failure of due process, this Court requires that the following four questions be answered affirmatively to show a due process violation, "(1) Was the defense un-

aware of the evidence? (2) Is the evidence favorable to the defense? (3) Is the evidence material to the defense? (4) Did the defense make a request for the evidence?" *Black v. Class*, 1997 SD 22, ¶ 16, 560 N.W.2d 544, 548 (citations omitted). Charles does not address this four-part test anywhere in his briefs. He simply focuses on the bullets and the lack of fingerprints or the potential fingerprints that might have been on them. His approach does not fully address our concern on appeal. Our job is to review the denial of judgment of acquittal by examining whether the State presented sufficient evidence to find Charles guilty beyond a reasonable doubt. *Augustine*, 2000 SD 93, ¶ 26, 614 N.W.2d at 800.

[¶ 14.] Charles would have us focus all of our attention on the bullets and the fingerprints that may or may not have been on them and ignore all the other evidence in this case. While it may be true that the spoliation of any fingerprints that may have been on the shells creates a presumption or inference that the evidence would not have supported the State's charges against Charles, we must not forget that any fingerprints on the bullets would have only been one piece of evidence. Charles seems to overlook the fact that the police conduct in examining and preserving the cartridges was in direct reaction to his false story regarding an accident resulting from shooting at a fox. The question we must resolve is whether the State produced sufficient evidence upon which the jury could find Charles guilty beyond a reasonable doubt. *Id.*

[¶ 15.] Charles complains that the State proceeded upon the theory that Charles loaded the rifle and then spoiled the evidence that could potentially have proven the opposite. Charles cross examined witnesses on this point and argued this point to the jury. Apparently, the

jury did not accept Charles' argument. Contrary to Charles' argument, the potential absence of his fingerprints on the bullets would not positively show he did not intentionally shoot Ingalls. It is entirely possible for a person to fire a weapon knowing it was loaded without having personally loaded the weapon.

[¶ 16.] The jurors heard evidence indicating that Charles' version of the event changed dramatically initially and then again altered slightly at trial. They heard W.L. testify about his conversation with Charles, wherein Charles indicated he purposefully killed Ingalls, that the fox hunting story was a lie and that Charles had contemplated other ways to kill Ingalls. They heard the testimony that Charles dragged Ingalls' body into the garage and shut the door, cleaned the blood off the sidewalk and cleaned the clothing he had worn. They heard that Charles correctly identified how many shells remained in the rifle although he denied loading it. Furthermore, the jurors heard Charles' argument about the spoiled fingerprint evidence and did not accept it.

[¶ 17.] When considering the evidence presented to the jury, it is clear the State produced sufficient evidence upon which the jury could base their decision to convict Charles of first degree murder.

[¶ 18.] **2. The trial court did not abuse its discretion in refusing to include a mistake of fact instruction.**

[¶ 19.] Trial courts have broad discretion in instructing the jury and it is not error for a court to refuse to amplify principles embodied in given instructions. *State v. Walton*, 1999 SD 80, ¶¶ 12–13, 600 N.W.2d 524, 528 (citations omitted). A criminal defendant is entitled to an instruction on his theory of the case when evidence exists to support his theory. *State v. Charger*, 2000 SD 70, ¶ 40, 611 N.W.2d 221, 229 (citations omitted). Jury

instructions are adequate when " 'they give a full and correct statement of the law applicable to the case.' " *State v. McVay*, 2000 SD 72, ¶ 18, 612 N.W.2d 572, 576 (citation omitted). On appeal, the defendant must show that, "the jury might and probably would have returned a different verdict, ..." with different instructions. *State v. Grey Owl*, 295 N.W.2d 748, 751 (S.D.1980).

[¶ 20.] Charles complains the trial court erred when it refused his proposed mistake of fact instruction which stated, "[a]n act is not a crime when committed or omitted under an ignorance or mistake of fact which disproves any criminal intent." The trial court instructed the jury on the elements of the crimes charged and gave a specific intent instruction which stated, "[I]n the crimes of First Degree Murder, [ ... ] Charles [ ... ] must have the specific intent to effectuate the death of Duane Ingalls. If this specific intent did not exist, the crime of First Degree Murder was not committed." We have previously decided whether it was error for a trial court to refuse a mistake of fact instruction stating " 'whenever an intent instruction involving the defendant's mental state is given, the *mistake of fact concept is automatically included and does not merit a separate instruction.*' " *State v. Johnston*, 478 N.W.2d 281, 283 (S.D.1991)(citing *State v. Griscom*, 101 N.M. 377, 683 P.2d 59 (App.1984)) (emphasis added). Viewing the instructions as a whole and our previous resolution of this issue, Charles failed to show any error by the trial court in refusing to give his proposed mistake of fact instruction.

[¶ 21.] Affirmed.

[¶ 22.] AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

[¶ 23.] SABERS, Justice, concurs specially.

SABERS, Justice (concurring specially).

[¶ 24.] I concur in the majority opinion except that I write separately to point out that in the future, the police and the prosecution should gather all relevant evidence before conducting tests that renders evidence useless. To do otherwise is irresponsible and actually harms the State in its search for justice. In this case, the State was able to meet its burden despite the presumption or inference created against it by its spoliation of evidence. In future cases, the State could dig itself into an inescapable hole before it gets to trial if it proceeds without caution.