2003 SD 14

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Douglas Q. MORAN, Jr., Defendant and Appellant.**

No. 22188.

Supreme Court of South Dakota.

Considered on Briefs Nov. 18, 2002.

Decided Feb. 5, 2003.

Rehearing Denied March 10, 2003.

Lawrence E. Long, Attorney General, Ann C. Meyer, Assistant Attorney General Pierre, South Dakota, Attorneys for plaintiff and appellee.

Terry L. Pechota of Viken, Viken, Pechota, Leach & Dewell, LLP, Rapid City, South Dakota, Attorneys for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.]   Defendant Douglas Q. Moran, Jr. (Moran) appeals from his conviction of

Rape in the Second Degree and Aggravated Assault. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] The following version of the facts is what T.B., the victim in this case, testified to at trial. On April 5, 2001, T.B. was visiting friends and drinking beer at Moran's residence in Mission, South Dakota. After Moran and his wife began arguing, T.B. decided to leave the house. As T.B. reached her car, Moran suddenly approached her from behind and pushed her away from the driver's seat. After Moran took T.B.'s keys and forced her into the passenger seat, he drove to a local gas station. At the gas station, Moran pushed T.B. to the floor of her vehicle and told her if she ran away "he'd just bring [her] back to the car." T.B. pleaded with Moran to let her go home.

[¶ 3.] After the gas station, Moran drove to a housing area in White River, South Dakota where he picked up his handicapped uncle, Kermit Bear Heels (Bear Heels). Moran also testified that his young nephew was in the back seat of the car sleeping during most of the evening. T.B. denied the nephew was ever in the car. T.B. testified she was pinned between Moran and Bear Heels in the front seat of her car. The three of them drove around White River and stopped at the Dollar Daze Café. T.B. stayed in the car and tried to escape by running down the street. Moran, however, grabbed T.B. and picked her up over his shoulder.

[¶ 4.] Later that evening and after consuming alcohol throughout the night, Moran parked at a park near a baseball field and told T.B. that the two men were going to "train her," which meant that Moran and his uncle were going to take turns forcing sex upon her. They pulled T.B. out of the vehicle and in doing so, the victim kicked the windshield of her car. Moran threw her on the ground, ripped off her clothes and raped her. During this attack, Moran put his fingers over her mouth and his thumbs underneath her chin, forcing T.B.'s head backwards so that she almost passed out.

[¶ 5.] After Moran finished his assault, he told his uncle "it was his turn." Bear Heels tried to penetrate the victim, but Moran pushed him off after T.B. began crying and screaming. After the three got back into the vehicle, Moran called T.B. a "bitch" and a "whore," because he could not trust women.

[¶ 6.] Moran made T.B. sit on his lap in the car as he sped at high speeds down a gravel road. Moran grabbed her arm and burned her with his hot cigarette on her wrist. At trial, T.B. showed the jury the permanent scar left on her wrist. Sometime during the course of the evening, T.B. also received a human bite mark, which left a large bruise on her breast. These were verified by pictures taken by law enforcement shortly after the incident. After being burned, T.B. told Moran she needed to throw up and he pulled the car over on the dirt road. After vomiting outside the car, T.B. tried once again to escape but Moran grabbed her and forced her back into the car.

[¶ 7.] Moran drove to a big water tank for cattle, an "artesian well." He and his uncle undressed and jumped into the tank. T.B. noticed that Moran had left the car keys by his jeans. She grabbed the keys and sped off for help. T.B. drove to a house, where a man helped her contact the Rosebud police.[1] Subsequently, Moran

---

1. During the course of the investigation, T.B. gave different versions of what had transpired that night. T.B. explained at trial that she had been drinking and had experienced traumatic memory loss. She experienced a mental

and Bear Heels were both charged with second-degree rape, aggravated assault, and kidnapping. Bear Heels entered a plea to aggravated assault pursuant to a plea agreement where he would testify against Moran.

[¶ 8.] T.B. was examined by Dr. Dillon, a physician with extensive forensic experience in sexual abuse cases. He testified for the State at trial. This expert related he had conducted a pelvic exam on T.B., and she had one laceration in the tissue of her vaginal vault, which was consistent with "forceful" penetration. Dr. Dillon also testified that T.B. had a human bite mark on her left breast, and a cigarette burn on her inner left wrist. He recalled that there were numerous bruises on her lower back, knees, and both lower legs and arms. There was no seminal fluid found during the course of his examination.

[¶ 9.] At trial, Moran testified that he had twice engaged in consensual sex with the victim. In addition, Moran claimed the victim had burnt her own wrist with a hot cigarette. The jury rejected his testimony and found Moran guilty of Rape in the Second Degree and Aggravated Assault. He was sentenced to twenty-five years for the rape conviction and fifteen for the conviction of Aggravated Assault. He raises the following issues for review:

1. Whether the trial court abused its discretion when it refused to dismiss the charges against Moran because of the State's discovery violations.

2. Whether the trial court abused its discretion when it denied Moran's motion to dismiss because the victim's vehicle was released without notice to Moran.

3. Whether the trial court abused its discretion when it denied Moran's motion of judgment of acquittal be-

cause of lack of sufficient and credible evidence.

4. Whether the trial court abused its discretion when it allowed the State to elicit certain testimony from Dr. Dillon at trial.

5. Whether the State gave an improper opening statement.

6. Whether the trial court abused its discretion when it allowed the State to elicit trial testimony that Moran's codefendant, Bear Heels, had pled guilty to aggravated assault.

7. Whether the trial court abused its discretion when it imposed consecutive sentences.

8. Whether the State improperly harassed and elicited improper testimony from Moran during cross-examination.

9. Whether the trial court abused its discretion when it answered a question that the jury posed during deliberations.

## STANDARD OF REVIEW

[¶ 10.] A violation of a discovery order and the court's resultant choice of, or failure to grant a remedy, is reviewed under an abuse of discretion standard. *State v. Guthrie*, 2001 SD 89, ¶¶ 7–11, 631 N.W.2d 190, 193–95. Additionally, the trial court has the inherent power to fashion an appropriate sanction for discovery violations in criminal cases. *Guthrie*, 2001 SD 89, ¶ 11, 631 N.W.2d at 194–95.

[¶ 11.] This Court reviews a motion for judgment of acquittal by deciding "whether [the] State set forth sufficient evidence from which the jury could reasonably find the defendant guilty of the crime charged." *State v. Frazier*, 2002 SD 66, ¶ 8, 646 N.W.2d 744, 748 (citing *State v.*

breakdown and was hospitalized in Sioux Falls for the majority of time before the trial.

*Holzer,* 2000 SD 75, ¶ 10, 611 N.W.2d 647, 650).

[¶ 12.] Trial courts retain broad discretion in ruling on the admissibility of an expert's opinion. *State v. Guthrie,* 2001 SD 61, ¶ 30, 627 N.W.2d 401, 414 (additional citations omitted). Decisions to admit or deny opinion evidence will not be reversed unless there is a clear showing of an abuse of discretion. *Id.*

[¶ 13.] The standard of review for prosecutorial misconduct is abuse of discretion. *State v. Corey,* 2001 SD 53, ¶ 19, 624 N.W.2d 841, 845. Under this standard, "not only must error be demonstrated, but it must also be shown to be prejudicial error." *State v. Perovich,* 2001 SD 96, ¶ 11, 632 N.W.2d 12, 15–16 (citing *State ex rel Dep't of Transp. v. Spiry,* 1996 SD 14, ¶ 11, 543 N.W.2d 260, 263) (additional citations omitted). "The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id.* (citing *State v. Goodroad,* 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129) (citing *State v. Rufener,* 392 N.W.2d 424, 426 (S.D.1986)).

[¶ 14.] This Court has stressed in *State v. Walton,* that the "trial court retains broad discretion concerning the limitation of cross examination," and it will only be reversed when there is a clear showing of prejudice. 1999 SD 80, ¶ 25, 600 N.W.2d 524, 530.

[¶ 15.] Under our standard of review, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law. *Sommervold v. Grevlos,* 518 N.W.2d 733, 739 (S.D.1994); *Frazier v. Norton,* 334 N.W.2d 865, 870 (S.D.1983); *Mueller v. Mueller,* 88 S.D. 446, 451, 221 N.W.2d 39, 42 (1974). Misleading, conflicting, or confusing instruc-

tions create reversible error. *Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, ¶ 19, 552 N.W.2d 801, 808; *Wallahan v. Black Hills Elec. Co-op., Inc.,* 523 N.W.2d 417, 423 (S.D.1994). Nonetheless, an appellant must show not only that a particular instruction was erroneous, but also that it was prejudicial, meaning the jury probably would have returned a different verdict if the faulty instruction had not been given. *Davis v. Knippling,* 1998 SD 31, ¶ 4, 576 N.W.2d 525, 526–7; *LDL Cattle Co., Inc. v. Guetter,* 1996 SD 22, ¶ 32, 544 N.W.2d 523, 530; *Sybesma v. Sybesma,* 534 N.W.2d 355, 359 (S.D.1995) (quoting *Chambers v. Dakotah Charter, Inc.,* 488 N.W.2d 63, 64 (S.D.1992)).

## ANALYSIS AND DECISION

[¶ 16.] **1.   Whether the trial court abused its discretion when it refused to dismiss the charges against Moran because of the State's discovery violations.**

[¶ 17.] Moran argues that the State refused to provide discovery to which he was entitled and as a result, his preparation for trial was adversely affected, his right to a speedy trial was prevented, and his right to a fair trial was materially prejudiced. Specifically, Moran complains he was not given adequate discovery on all ambulance crew reports, photographs, investigator's reports, the rifle that Moran was carrying when he was arrested, and results of tests. Moran believes that "all the nondisclosed items cumulatively" would have changed the result of his trial. Essentially, Moran argues that he was deprived of a right to a fair trial under the Fourth, Sixth, and Fourteenth Amendments to the United States and South Dakota Constitutions. As a result, he urges us to overturn his conviction.

[¶ 18.] On July 10, 2001, during a hearing, the State indicated it had turned over everything it had. At this hearing, Moran argued that the State should not only turn over information that it possessed, but it should also obtain evidence that Moran requested. The trial court rejected this contention. Again, before a July 24, 2001 hearing, Moran brought a motion for an order regarding discovery. In his motion, he set forth ten items that he wanted the State to give him. The State was ordered to produce the discovery by August 5, 2001.

[¶ 19.] On August 8, 2001, another hearing was held regarding discovery. At the time, the State was ordered to produce all discovery by August 13 or risk sanctions. Finally, at the August 14, 2001 hearing, the court ordered everything that was not produced by the State, to be suppressed except for potential DNA evidence. Significantly, as an additional sanction, the court dismissed the kidnapping charge against both defendants.[2] However, it refused to dismiss the rape or aggravated assault charges.

[¶ 20.] It is important to note that the trial judge found that some of Moran's discovery requests were beyond the State's ability to obtain and that the State was not required to prepare or investigate Moran's case. Additionally, the court found that none of the State's nondisclosure problems had been deliberate. For example, the photos taken of the park or artesian well scenes did not turn out. The gun that was found on Moran when he was arrested was being held in the State's evidence room because it related to another potential criminal situation. Furthermore,

it was not alleged by T.B. that a gun was used in connection with the alleged acts that took place. The prosecutor explained that he did not have the requisite jurisdiction to compel the disclosure of tribal investigative reports or ambulance reports. All that he had been able to obtain were some FBI reports. In addition, the State contends that the results of the sexual assault kit, or any DNA testing, did not show anything for an expert to evaluate. As a remedy, the trial court allowed the defense to depose several state investigators to remedy any problems with unwritten or undisclosed reports.

[¶ 21.] As the State argues, after reviewing the record, there appears to be no renewal by Moran of his objection to the trial court's order which continued his trial to September 17, 2002, dismissed Moran's kidnapping charge, and suppressed all of the evidence discovered in the victim's car. *See State v. Andrews*, 2001 SD 31, ¶ 19, 623 N.W.2d 78, 83–84 (stating that "failure to object at trial constitutes a waiver of the issue on appeal"); *State v. Roden*, 380 N.W.2d 669, 671 (S.D.1986).

[¶ 22.] Even assuming that this issue was not waived, we find that the trial court did not abuse its discretion when it formulated three different sanctions to deal with any discovery violations by the prosecution. *Guthrie*, 2001 SD 89, ¶ 11, 631 N.W.2d at 194 (finding that a trial court has the inherent power to fashion appropriate sanctions for discovery violations). The trial court made a careful analysis of Moran's right to discovery balanced against the State's forensic and tribal jurisdictional problems.[3] After this analysis, the trial court decided to dismiss the kid-

---

**2.** The State did not file a notice of review upon this sanction levied by the trial court. Therefore, we express no opinion on its appropriateness.

**3.** In *State v. Lufkins*, 381 N.W.2d 263, 266–67 (S.D.1986), this Court recognized the jurisdictional problems facing South Dakota law enforcement when attempting to exert the criminal process of the State of South Dakota into Indian Country.

napping charge against Moran, suppress all of the evidence found in victim's car, except potential DNA results, and give Moran additional time to depose five of the State's investigators in this case.

[¶ 23.] Moran cannot establish that the trial court abused its discretion and Moran cannot show that he was prejudiced. As we stated in *State v. Sorenson*, "we will not reverse a ruling reviewed under an abuse of discretion standard absent a showing of prejudice." 2000 SD 127, ¶ 10, 617 N.W.2d 146, 148 (citing *State v. Daniel*, 2000 SD 18, ¶ 13, 606 N.W.2d 532, 535). Although Moran complains that he did not have the opportunity to hire an expert to analyze any DNA evidence found, Moran's defense at trial was that T.B. had consented to sexual intercourse with him. Therefore, it would have been futile for him to hire his own DNA expert. Additionally, there was apparently no DNA evidence found on the sexual assault kit, which the trial court gave the defense extra time to pursue. Moran also conceded at trial that when he was drinking, he did not ejaculate. This would also support the conclusion that no semen would be found in the victim's body, on the victim's clothes, or her car.

[¶ 24.] Moran was convicted of the crimes charged because of the victim's testimony and Dr. Dillon's testimony, along with other evidence presented at trial. Dr. Dillon testified T.B. had a bite mark on her breast, a burn mark on her left wrist, extensive bruising on the outside of her body, and a lesion on her vaginal vault, which was consistent with forced sex. Moran cannot show how any additional exculpatory evidence would have changed the result of his trial.

[¶ 25.] **2. Whether the trial court abused its discretion when it denied Moran's motion to dismiss because the victim's vehicle was released without notice to Moran.**

[¶ 26.] The vehicle that T.B. owned was a customized Cadillac. This was the vehicle that Moran and T.B. traveled in on the night of the assault and rape. The vehicle was taken into possession by the State on April 6, 2001, at a residence near Bad Nation, where T.B. had driven it after she escaped her captors. It was taken to the South Dakota Department of Transportation Shop at White River. Moran made a motion to have an expert appointed to examine the windshield of the vehicle. T.B. had told authorities she had kicked the windshield of the car when she was fighting her attackers. At a July 24, 2001, hearing on that motion, the State informed the court that the car had been released back to the victim.

[¶ 27.] Moran argues that pursuant to SDCL 23A–37–14 and 15, release of the vehicle without notice to Moran violated his due process rights. In its entirety, SDCL 23A–37–14 provides:

Any property, which is not contraband, seized or confiscated by law enforcement personnel, ostensibly for use as evidence in a criminal prosecution, shall be preserved, maintained or stored at the expense of the county where the criminal offense occurred. If the property is not contraband and is owned by a victim of the crime being investigated, the property shall be photographed by the appropriate law enforcement personnel and returned to the victim of the crime within thirty days of completion of forensic analysis unless the prosecuting attorney deems it essential to the prosecution of the case to retain the evidence. The photographs shall accurately and correctly represent the property and are admissible evidence pursuant to chapter

19–18 in any resulting criminal proceeding.

[¶ 28.] SDCL 23A–37–15 provides:

Before any property is returned to the owner pursuant to § 23A–37–14, the law enforcement personnel in possession of the property shall notify the defendant that the property will be returned to the owner. Upon a motion made by the defendant and upon good cause shown that the property contains exculpatory evidence of the defendant's innocence, the court may order the law enforcement personnel in possession of the property not to release it to the owner.

[¶ 29.] In *State v. Lyerla*, the defendant, while driving down an interstate, shot and killed a teenage girl and injured two others. 424 N.W.2d 908, 909–10 (S.D. 1988) (holding that although the evidence was improperly destroyed, it did not warrant dismissal of the charges). The defendant argued that because the State released the victim's pickup back to the family without notifying him, he was unable to run certain forensic tests to show who was driving. *Id.* at 909. In that case, we stated that "whether the prosecution's suppression of evidence violates due process, the focus should be on the influence nondisclosure had on the outcome of the trial." *Id.* at 910.

[¶ 30.] We have recently held that a defendant must show the following four questions affirmatively to establish a due process violation: (1) Was the defense aware of the evidence? (2) Is the evidence favorable to the defense? (3) Is the evidence material to the defense? (4) Did the defense make a request for the evidence? *State v. Charles*, 2001 SD 67, ¶ 13, 628 N.W.2d 734, 737 (additional citations omitted). "However, not every case where the State has suppressed evidence results in a violation of a defendant's due process

rights." *Fowler v. Weber*, 2000 SD 22, ¶ 8, 607 N.W.2d 252, 254–55 (citations omitted).

[¶ 31.] The trial court implemented discovery sanctions, which included the dismissal of Moran's kidnapping charge and the suppression of any evidence, which had been uncovered in the victim's car, except for possible DNA results. This ruling meant that although there were several items found in the car that supported T.B.'s trial testimony, none of it could be presented at trial.

[¶ 32.] Moran has not persuaded us that there was any exculpatory evidence present in the vehicle. As such, Moran cannot show how any evidence found in the car would have been material to, or changed the outcome of his trial. Concerning Moran's argument that there may have been semen in the car, T.B. testified at trial that the rape occurred outside the car at the baseball field. Equally important, Moran himself testified that he never ejaculates when he has been drinking. Therefore, based on both Moran and T.B.'s testimony, there would not have been any semen found in the car.

[¶ 33.] Moran also argues that other exculpatory evidence would have been present in the car. However, the State conducted a careful search of the car and found no such evidence. Although Moran contends that if given the chance, he could have examined the car for items such as cigarettes, hairs, skin, and mud, it is highly improbable that any of these items would have served to change the outcome of his trial.

[¶ 34.] Because T.B. and Moran testified that they were both present in T.B.'s car, hairs from either of them would not have shown anything relevant. Likewise, Moran testified that he had been smoking in T.B.'s car and therefore, any ashes or smoked cigarettes found in the car would have equally been irrelevant. As for any

possible skin samples found inside the car, T.B. testified she had been burned by Moran, and any such recovered evidence would have been inculpatory, rather than exculpatory. *State v. Strohl*, 255 Neb. 918, 928–29, 587 N.W.2d 675, 682–84 (1999) (finding that there is no due process violation when inculpatory evidence is not turned over to defense). Finally, the investigators for the State testified by deposition that there was a normal amount of dirt, grass, and gravel in T.B.'s car. The defendant has not shown that the exculpatory value of all the evidence taken together would have changed the outcome of his trial. *Charles*, 2001 SD 67, ¶ 17, 628 N.W.2d at 738.

[¶ 35.] **3.** **Whether the trial court abused its discretion when it denied Moran's motion of judgment of acquittal because of lack of sufficient and credible evidence.**

[¶ 36.] Moran argues that the trial court improperly denied his two motions for judgment of acquittal at the close of the evidence presented by both parties at trial. Moreover, Moran argues that no jury would have found him guilty beyond a reasonable doubt because of the various inconsistencies in the victim's trial testimony. However, it is the function of the jury in resolving factual conflicts, to weigh the credibility of those who testify, and ascertain the truth. *State v. Pugh*, 2002 SD 16, ¶ 9, 640 N.W.2d 79, 82.

[¶ 37.] Although it may be true that T.B. had inconsistencies in her trial testimony from earlier interviews with officials, she explained this at trial by testifying that she had been drinking and had been traumatized by her brutal experience. Dr. Dillon also testified that it was not unusual in rape cases that a victim would have trouble remembering the exact events of the assault. Furthermore, there was more than sufficient evidence present-

ed at trial to support Moran's guilt for second-degree rape and aggravated assault.

[¶ 38.] At trial, T.B. testified about what she remembered from the night she was attacked. She testified that she was taken against her will to the park and forced to have sex with Moran. She tried to escape several times but was unable to get away until Moran and Bear Heels jumped into the water tank. Dr. Dillon's testimony of T.B.'s injuries corroborated much of what she said. *State v. Bunger*, 2001 SD 116, ¶ 9, 633 N.W.2d 606, 609 (finding that "although corroborating evidence is never necessary for conviction of a sexual offense, it tends to reinforce the proof supporting the charge").

[¶ 39.] Moran testified that he engaged in consensual sex with T.B. on two separate occasions while his nephew was in the back seat of the car. He also testified that not until he told T.B. that he was not going to leave his wife, did she become upset. He also testified that the burn on her wrist could be self-inflicted and he did not know the source of the bite and bruise mark on her breast. However, by their conviction, the jury rejected Moran's testimony. It is not the function of this Court to reweigh or resolve conflicts or judge the credibility of the witnesses. *State v. Holway*, 2002 SD 50, ¶ 11, 644 N.W.2d 624, 628 (citing *State v. Karlen*, 1999 SD 12, ¶ 49, 589 N.W.2d 594, 605). Further, we have stated:

In determining the sufficiency of the evidence on review, the question presented is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In this review, we must accept that evidence, and the most favorable inferences to be fairly drawn therefrom, which will

support the verdict. In determining the sufficiency of the evidence, this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt.

*State v. Buchholz,* 1999 SD 110, ¶ 33, 598 N.W.2d 899, 905 (citing *State v. Knecht,* 1997 SD 53, ¶ 22, 563 N.W.2d 413, 421).

[¶ 40.] When considering the evidence that was available at trial, we conclude there was sufficient evidence set forth by the State from which the jury could reasonably find the defendant guilty of the crimes charged. *Frazier,* 2002 SD 66, ¶ 15, 646 N.W.2d at 750; *see also Charles,* 2001 SD 67, ¶ 17, 628 N.W.2d at 738 (holding that defendant was unable to show prejudicial error in light of evidence presented against him at trial).

[¶ 41.] **4. Whether the trial court abused its discretion when it allowed the State to elicit certain testimony from Dr. Dillon at trial.**

[¶ 42.] Moran argues that the State asked Dr. Dillon several improper questions during its case-in-chief. Specifically, he contends that the trial court impermissibly allowed Dr. Dillon to opine that T.B. had nonconsensual intercourse with Moran, and that T.B. had been burned by someone who was experienced enough to know that her inner wrist was a very sensitive spot. Additionally, he charges that the following testimony elicited from Dr. Dillon was "damning and prejudicial":

Q.(Prosecutor): The bruises, that's consistent with a rape?

A.(Dr. Dillon): Yes, sir.

Q.(Prosecutor): Forcible sexual act anyhow. And she had an abrasion or cut?

A.(Dr. Dillon): Yes, sir.

Q.(Prosecutor): All right. Would those things be consistent with a rape victim?

A.(Dr. Dillon): Yes, sir.

Q.(Prosecutor): All right, would they not be consistent with a non-rape victim?

A.(Dr. Dillon): No, sir.

Q.(Prosecutor): So you wouldn't have that with a non-rape, if it was consensual?

A.(Dr. Dillon): It—it was too violent to be consensual.

[¶ 43.] Moran contends that an expert witness cannot invade the province of the jury in a criminal case and offer his opinion on the ultimate question that the jury has to determine. However, our State repealed the "ultimate issue" rule in 1993. This rule has been replaced with SDCL 19–15–4 (FRE 704), which provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." An expert can testify as to the ultimate issue "as long as the witness is not asked whether the defendant is innocent or guilty." *State v. Barber,* 1996 SD 96, ¶ 38, 552 N.W.2d 817, 823 (citations omitted). Furthermore, under SDCL 19–15–2 (FRE 702):

If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[¶ 44.] Here, Dr. Dillon was not asked whether Moran was guilty. He was asked his opinion regarding whether T.B.'s injuries were consistent with sexual assault. This was simply expert testimony

given by a doctor with many years of medical experience and who had extensive medical and forensics experience in examining rape victims. As we recently held in *State v. Running Bird*, a medical doctor's testimony that does not give an opinion as to defendant's guilt and only states that the victim's injuries did not indicate consent, does not invade the province of the jury. 2002 SD 86, ¶ 40, 649 N.W.2d 609, 617. The admission of this testimony, therefore, was not an abuse of discretion and did not invade the province of the jury. *See id.*

[¶ 45.] **5. Whether the State gave an improper opening statement.**

[¶ 46.] Moran argues in this issue that the following portion of the prosecutor's opening statement was argumentative and inflammatory:

It's a brutal rape. We're going to show you it's a brutal rape. It wasn't just a rape. They burned her with a cigarette. They bit her breast. They drug her out of the car. We're going to show you people it's a brutal, brutal rape and assault.

Moran argues these remarks were in violation of SDCL 15–14–1(2). This statute provides:

The plaintiff or party having the burden of proof shall state the issues and the general nature of the evidence he expects to produce in substantiation of the issues by stating what he claims the issuable facts to be, without argument, and without naming or identifying any particular witness or exhibit by which he expects to prove any of such issuable facts unless permitted by the court.

[¶ 47.] First of all, as the trial court instructed the jury, any arguments or remarks by the attorneys on either side at trial does not constitute evidence. *State v. Brewer*, 266 N.W.2d 560, 562 (S.D.1978)

(stating that under SDCL 15–14–1(1) and (2), "[t]he opening statement is a statement of what counsel expects the evidence to show, and it is not evidence in and of itself.").

[¶ 48.] Through its opening statement, the State informed the jury the evidence it would present during the course of the trial. To substantiate what was told to the jury during opening statements, the victim testified to the violent nature of the sexual attack, including how she was dragged from the car, how her chin was forcefully pushed back, and how she was burned with a cigarette. Parts of T.B.'s testimony were corroborated by other witnesses as well. For example, Dr. Dillon testified to T.B.'s injuries and described the sexual attack as "violent." Also, an investigator, Grace Her Many Horses, who interviewed T.B. shortly after the night in question, testified that T.B. had a fresh human bite mark on her left breast and a cigarette burn on her wrist, which T.B. indicated Moran had caused. The photographs shown to the jury depicted much of the same injuries that T.B. and others testified to at trial. Accordingly, the prosecution did not use dishonesty or deception when he accurately portrayed the physical and sexual abuse, which the victim had suffered as brutal in nature. *See State v. Lee*, 1999 SD 81, ¶ 21, 599 N.W.2d 630, 634 (finding that although the prosecutor expressed his opinion during closing arguments, it did not reach the level of reversible error). These comments fell within the reasonable latitude afforded prosecutors in this context. Therefore, Moran is not entitled to relief under this issue.

[¶ 49.] **6. Whether the trial court abused its discretion when it allowed the State to elicit trial testimony that Moran's codefendant,**

**Bear Heels, had pled guilty to aggravated assault.**

[¶ 50.] Prior to trial, the court ruled on the basis of *Bruton v. United States*, that the State could not elicit testimony at trial concerning any statement made to law enforcement officers by the original codefendant, Bear Heels. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Moran argues that when the State called Mike Braley, Special Agent with the Division of Criminal Investigation, it brought out information concerning Bear Heels' plea agreement. Moran argues that this testimony was wholly irrelevant, prejudicial, and improper. Further, Moran charges that he was convicted on the basis of testimony that a codefendant had admitted his guilt, violating Moran's due process rights and rendering his trial unfair.

[¶ 51.] The State argues that Moran opened the door to this line of questioning during his opening statement in which the defense made mention of Bear Heels' plea bargain. Specifically, during the defense counsel's opening statement, he told the jury, "Mr. Bear Heels, I think when you hear the evidence [that you] will agree that he got a real sweetheart of a deal and he's going to be testifying for the State." During trial, however, Bear Heels was not called as a witness for either side.

[¶ 52.] In *Bruton*, the United States Supreme Court held that admission of codefendant's confession through a witness at trial and which implicated defendant, violated defendant's constitutional right of confrontation. 391 U.S. at 126, 88 S.Ct. at 1622, 20 L.Ed.2d at 479. However, in the instant case, after a review of the record, the State did not elicit testimony from Special Agent Braley concerning statements made by Bear Heels about Moran's guilt. Additionally, only after Moran's attorney made the remarks during opening statement concerning the deal that Bear Heels received, did the State ask Special Agent Braley questions about the plea agreement on direct examination. *See State v. Letcher*, 1996 SD 88, ¶ 26, 552 N.W.2d 402, 406 (concluding that defendant opened the door to the State's expert testimony).

[¶ 53.] It is also important to note that when the defense cross-examined Special Agent Braley, it started delving into the specifics of what was said by Bear Heels during his interview with Special Agent Braley. The trial court called both attorneys into chambers and cautioned the defense that it was dangerously close to reversing the trial court's *Bruton* order. Specifically, the trial court cautioned:

> Counsel, I previously suppressed Mr. Bear Heels' statement. If you go much further—in fact, if you ask another question about it I'm going to reverse that order of suppression. Now, you're welcome to do that. Just be advised that you're on the verge of making it admissible.

[¶ 54.] It was the defense that came close to eliciting improper statements from Special Agent Braley, not the State. Further, Special Agent Braley did not testify concerning any confessions Bear Heels may have made or concerning any statements implicating Moran. Therefore, the trial court's *Bruton* order was not violated. Finally, although Moran argues in this appeal that he was convicted based on improper testimony given by Special Agent Braley, this was not the case. He was convicted based upon the victim's testimony and the corroborating evidence which supported it. *See State v. Owens*, 2002 SD 42, ¶ 86, 643 N.W.2d 735, 756 (finding that sufficient corroborating evidence existed to make admission of irrelevant evidence harmless error).

**[¶ 55.] 7. Whether the trial court abused its discretion when it imposed consecutive sentences.**

[¶ 56.] Moran was sentenced to twenty-five years on the second-degree rape conviction and fifteen years on the aggravated assault conviction, with the sentences to run consecutively. Moran argues that the trial court abused its discretion when it determined the sentences should run consecutively, rather than concurrently. He argues that both convictions arose out of one incident involving one victim; Moran has never been convicted of a violent crime prior to this conviction; the court ignored the circumstances out of which the incident evolved, namely, one involving considerable drinking by all parties involved; and it is wholly inappropriate to give consecutive sentences where there is a legitimate jury question as to whether the sexual intercourse was consensual.

[¶ 57.] The trial court is given authority through SDCL 22-6-6.1 to impose consecutive sentences at its discretion. This statute reads:

> If a defendant has been convicted of two or more offenses, regardless of when the offenses were committed or when the judgment or sentence was entered, the judgment or sentence may be that the imprisonment on any of the offenses or convictions may run concurrently or consecutively at the discretion of the court.

[¶ 58.] The trial court looked at the nature of the crime, Moran's prior conviction for burglary, his drug and alcohol problem and his lack of employment when imposing sentence. Furthermore, the rape and aggravated assault were two separate and distinct acts for which Moran was convicted. *See State v. Puthoff,* 1997 SD 83, ¶¶ 15–16, 566 N.W.2d 439, 443 (holding that the act of burglary and aggravated assault were two separate and

distinct acts). T.B. testified at trial that she had been raped at the park and later burned on her wrist while inside the car.

[¶ 59.] A sentencing court is empowered to impose consecutive sentences for separate and distinct criminal acts that were completed before the next act began. *Id.* We reject Moran's arguments under this issue and find that the trial court did not abuse its discretion when it imposed consecutive sentences.

**[¶ 60.] 8. Whether the State improperly harassed and elicited improper testimony from Moran during cross-examination.**

[¶ 61.] Moran contends that during his cross-examination by the prosecution, he was harassed, badgered and improper information was elicited from him. He argues that it was improper when he was asked whether he had a reputation for being tough, and why his nephew had not come forward earlier at the preliminary hearing. He argues that he was further harassed about the manner in which the bite mark was placed on T.B.'s breast. He claims the prosecutor attempted to place him in a bad light through this line of questioning.

[¶ 62.] While prosecutors may not comment on the defendant's failure to testify, or right to remain silent, they may mention the defendant's failure to call other witnesses. *Lodermeier v. Class,* 1996 SD 134, ¶ 18, 555 N.W.2d 618, 624–25. Further, during the prosecution's line of questioning concerning Moran being a "tough guy," the trial court sustained an objection to these questions, and the line of attack was dropped by the State.

[¶ 63.] A trial court is allowed a wide amount of discretion concerning the scope of cross-examination and it will only be reversed upon a showing of unfair prej-

udice. *Walton,* 1999 SD 80, ¶ 25, 600 N.W.2d at 530. Here, Moran cannot show prejudice. The prosecution in no way attempted to shift the burden of proof to Moran when he was asked about his failure to produce his nephew earlier. Finally, the trial court properly instructed the jury regarding the burden of proof at the close of the evidence. *See Lodermeier,* 1996 SD 134, ¶ 18, 555 N.W.2d at 625. Therefore, Moran's arguments under this issue are rejected.

[¶ 64.]   **9.   Whether the trial court abused its discretion when it answered a question that the jury posed during deliberations.**

[¶ 65.]   The Information charged a separate count of aggravated assault as Moran allegedly did "burn her body with a cigarette and bite her breast." The bite mark left bruises. During deliberations, the jury submitted a question to the judge. The jury sent a note asking whether it was "supposed to *consider* the bruises and abrasions caused from the alleged rape in the second charge of aggravated assault." (emphasis added).

[¶ 66.]   The trial court after hearing argument as to this question, answered in the affirmative to this inquiry with the response, "[t]he answer is yes." Moran argues that this answer allowed the jury to convict Moran on the basis of conduct not charged in the Information. Further, Moran maintains that the trial court's affirmative answer precluded the jury from returning a verdict on the lesser-included offense of simple assault.

[¶ 67.]   We have previously held that a trial court may answer questions posed by the jury during deliberations. *State v. Kaiser,* 504 N.W.2d 96, 101 (S.D. 1993). We find that the trial court did not abuse its discretion when it answered "yes" in response to the jury's question.

[¶ 68.]   It had been clear from the start of the criminal proceedings that the State was alleging the sex act at the park as the source of the rape charge and the bite mark with its underlying bruises and burn mark as the basis of the separate aggravated assault charge. The evidentiary determination of the aggravated assault charge was essentially a matter of credibility of T.B.'s testimony against Moran's testimony. While there was no question T.B. had a burn mark on her wrist and a bite mark with accompanying bruises on her breast, the source of these injuries was hotly disputed between the two witnesses. The State claimed they were inflicted by the defendant. The defendant countered they were not committed by himself and the cigarette burn was self-inflicted by T.B. upon herself. The State pointed out the fact that there were bruises on other portions of T.B.'s body involved with the sex at the park, be it rape or consensual. It argued since Moran admitted having sex with T.B., the bruises on the other parts of her body, such as on her back, were relevant to determining the source of bruises on the bite mark on her breast.[4] Upon that basis, the trial court indicated in its answer of "yes" that it was proper for the jury to "consider the bruises and abrasions caused from the alleged rape in the second charge of aggravated assault[.]"

[¶ 69.]   The jury was also properly instructed to consider the two criminal charges separately.[5] The language in the

---

4.   The trial court had already correctly instructed the jury on this point when it informed them: "[c]redibility of a witness may be attacked by evidence that the witness previously said or did something inconsistent with the testimony of a witness at trial on a material issue." (32)

5.   Instruction # 25 stated:

jury's question shows it clearly understood the legal and evidentiary basis between the two charges. Thus, in this context, the factual allegations concerning both charges were clearly defined and the answer of the trial court did not interject unfairness nor confusion into the jury's deliberation. The jury merely asked if it should "consider" the bruises from the sex act as they pertained to the aggravated assault charge of the bite on the breast and the cigarette burn.[6] It was proper[7] for the jury to make such a consideration on the basis of its duty to determine the credibility of the two conflicting witnesses.[8]

■■■ [¶ 70.] The jury was instructed to consider the instructions as a whole. "Jury instructions are sufficient when, con-sidered as a whole, they correctly state the applicable law and inform the jury." *State v. Eagle Star,* 1996 SD 143, ¶ 13, 558 N.W.2d 70, 72 (citations omitted). Finally, the jury was properly instructed on the differences between aggravated assault and simple assault.

[¶ 71.] Moran fails to show not only that the particular comment was erroneous but more importantly, that it was prejudicial to the point where the jury would probably have returned a different verdict if the court's answer had not been given. *Davis,* 1998 SD 31, ¶ 4, 576 N.W.2d at 527; *LDL Cattle Co.,* 1996 SD 22, ¶ 35, 544 N.W.2d at 530; *Sybesma,* 534 N.W.2d at 359. For this to occur, the jury would have had to adopt the highly unlikely testi-

---

A separate offense is charged in each count of the Information. You must consider each count and the evidence which applies to it separately. If you find the defendant guilty or not guilty on any one count of the Information, your verdict on that count must not control or influence your verdict on any other count.

**6.** Without citation, the dissent concludes "[i]n this context, 'supposed to,' translates to 'should,' which translates to 'shall.'" The trial court never so informed the jury and there is no authority cited other than the subjective interpretation of the dissent that such suppositions were considered by the jury or are even correct.

**7.** The dissent argues that "[t]he jury's question had nothing whatsoever to do with the 'bruises from the sex act as they pertained to the aggravated assault charge of the bite on the breast and cigarette burn.'" However, the trial transcript of the receipt of the jury note indicates to the contrary.

THE COURT: Question Number 2, "Are we supposed to consider the bruises and abrasions caused from the alleged rape in the second charge of aggravated assault?" What's your proposal?
MR. STRAIN: [THE PROSECUTOR] Are they talking about the lesser included?
THE COURT: No, they're talking about the charge of aggravated assault.

I'll read it again. "Are we supposed to consider the bruises and abrasions caused from the alleged rape in the second charge of aggravated assault?"
MR. STRAIN: *I'd say yes to include the bruises in there. You have bruises on the [victim's breast."]* (emphasis added).
MS. TOLLEFSON: [THE DEFENSE ATTORNEY] I'd say no, Your Honor. First of all, the information has to-wit in it that— that they—that he burned and bit. There's nothing about any other bruises or abrasions . . .
. . .
THE COURT: I am going to send the following answer to the jury. "The answer is yes." Tr. 637–8.
Thus, before the court gave it's ruling and answer to the jury, it had the benefit of argument from both opposing council directly on this point.

**8.** Other jury instructions are also pertinent to this matter. The trial court instructed "intent is shown by the circumstances surrounding the act, the manner in which it is done, and the means used." (18). It also instructed:

You may consider ability and opportunity to observe, memory, manner while testifying, any interest, bias, or prejudice, and the reasonableness of the testimony in the light of all the evidence in the case, in deciding which witnesses are credible and how much weight to give their testimony. (27)

mony advanced by the defendant that T.B. self-mutilated herself while in the car.

[¶ 72.] Affirmed.

[¶ 73.] AMUNDSON, Retired Justice, concurs.

[¶ 74.] KONENKAMP and ZINTER, Justices, concur specially.

[¶ 75.] SABERS, Justice, concurs in result in part and dissents in part.

[¶ 76.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

ZINTER, Justice (concurring specially).

[¶ 77.] I concur and write specially on Issue 9 to discuss the trial court's instruction which permitted the jury to "consider" the vaginal, back, leg and knee bruises and abrasions from the rape (rape trauma) on the charge of aggravated assault. The question is, how did the jury use that rape trauma evidence in its consideration of the aggravated assault charge. The Court focuses on a permissible use of the rape trauma evidence, while the dissent focuses on an impermissible use of that evidence.

[¶ 78.] While I cannot join the language of the dissent, I agree with its conclusion that the jury's question and the literal language of the trial court's responsive instruction made it theoretically *possible* for the jury to use the rape trauma as substantive evidence to support the charge of aggravated assault. On the other hand, the Court correctly points out that it was also *possible* that the rape trauma was properly used by the jury as credibility evidence[9] to reject Moran's testimony on

---

9. The dissent concludes that neither the trial court nor the attorneys indicated that the jury question had anything to do with the credibility of witnesses. *Infra* n. 10. Moreover, the dissent suggests that "counsel *did* contemplate that the rape trauma would be used as substantive evidence of the aggravated assault." *Id.* To support these propositions, the dissent relies on the defendant's, but not the states attorney's response to the jury question. However, the omitted portion of the discussion clearly suggests that the states attorney did not contemplate use of the *rape trauma* as substantive evidence in proving his case. The states attorney's only argument for answering the jury question in the affirmative was "I'd say yes to include the bruises in there. You have bruises on the [breast]", which was an obvious reference to the assault trauma, not the rape trauma. This use of the evidence was consistent with the states attorney's argument to the jury. In that argument, he never even inferred that the rape trauma was substantive evidence of the aggravated assault. On the contrary, the states attorney only argued that the burn and bite supported that charge ("Then we go to get to the aggravated assault. And she had a bite here, but the burn itself is—that's complete indifference and it's—it's a serious bodily injury."). Thus, it appears from the transcript that the state's attorney was not even referring to use of the rape trauma when he suggested that the answer to the jury question should be "yes." There is certainly nothing in the transcript to suggest that counsel contemplated using rape trauma as substantive evidence in his prosecution of the aggravated assault charge.

If anything, the *entire* transcript actually explains why the jury most probably contemplated use of the rape trauma as impeachment evidence. In final argument, Moran's counsel continued the defense theme of consensual sexual relations that evening. With respect to the assault, defense counsel continued that defense by arguing that the marks on T.B.'s breast were the result of consensual activity. Moran's counsel argued "I look at the picture and I don't see any teeth marks and it looks to me if you've got a—it looks like a hickey to me. I'm sorry, that's what it looks like." Given this defense argument, it is understandable that the jury would ask to consider the rape trauma as physical evidence that was inconsistent with Moran's defense and tended to impeach both Moran's claim of consensual sexual intercourse and his claim of consensual trauma on T.B.'s breast. Ultimately, however, it may be fairer to simply conclude that the cold transcript is not conclusive on this issue.

the assault charge. This proper use was quite plausible because the rape trauma clearly tended to disprove Moran's claim that the sexual intercourse was consensual. If the evidence of rape trauma caused the jury to disbelieve Moran's claim of consensual sexual intercourse, that jury determination would also tend to discredit Moran's claim that the aggravated assault trauma (the burn and the bite mark on the breast) were consensual, self-inflicted or caused by someone else. The problem is that we do not definitively know whether the jury properly "considered" the evidence on Moran's credibility as suggested by the Court, or improperly as substantive evidence as suggested by the dissent.

[¶ 79.] That being the case, the dispositive question on appellate review is whether, in light of these two possible uses, Moran met his burden of establishing reversible error from the instruction. Moran's burden in that regard is well settled. "An appellant has the burden to show not only that the instruction given was in error, but also that it was prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict if the [objectionable instruction] had [not] been given." *State v. Aesoph,* 2002 SD 71, ¶ 47, 647 N.W.2d 743, 758 (citations omitted). Stated another way, an appellant "must demonstrate that, had the jury not been given the instruction ..., it would likely have reached a different result." *Id.* at ¶ 48 (citing *State v. Frazier,* 2001 SD 19, ¶ 35, 622 N.W.2d 246, 259). *Accord, State v. Pellegrino,* 1998 SD 39, ¶ 9, 577 N.W.2d 590, 594 (defendant must show that refusal to grant an instruction probably would have returned a different verdict if the requested instruction had been given); *State v. Rhines,* 1996 SD 55, ¶ 111, 548 N.W.2d 415, 443 (defendant must show that the trial court's refusal to give an appropriate instruction unfairly prejudiced the defendant); *State v. Bart-*

*lett,* 411 N.W.2d 411, 415 (S.D.1987) (defendant must successfully show a circuit court error of such proportions that the jury might and probably would have come to a different verdict if the defendant's instruction had been given); *State v. Grey Owl,* 295 N.W.2d 748, 751 (S.D.1980)(appellant must show prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict if appellant's instruction had been given). Therefore, assuming that the instruction was erroneous, Moran must still have established that under the evidence, the jury might, and probably would have returned a different verdict if a different instruction were given.

[¶ 80.] However, Moran failed to meet this burden for three reasons. First, as the Court points out, the jury was correctly instructed on the need to separately consider the separate charges and separate evidence supporting those charges. *Supra* n. 5. The jury was also correctly instructed on impeachment. *Supra* n. 4. Thus, the jury was correctly instructed on how to use the disputed evidence. Second, in addition to being properly instructed, there was substantial physical evidence of serious bodily injury that was wholly independent of the trauma suffered in the rape. Neither the scarring left from the cigarette burn nor the bruising and related bite mark were allegedly caused by the rape. Therefore, there was sufficient independent evidence to sustain the jury's finding of aggravated assault.

[¶ 81.] Finally, the jury verdicts themselves suggest that the rape trauma evidence was used to impeach Moran's credibility rather than being used as substantive evidence. After all, the only questions in dispute were whether the rape was consensual and whether the burn and bite mark were inflicted by Moran. Moran disputed both allegations

claiming that the sexual intercourse was consensual and that the assault injuries were consensual, self-inflicted or caused by someone else. To resolve those factual disputes, the jury was required to decide whether it believed Moran or T.B.'s version of the events. Moran's counsel even made that argument to the jury. She stated "ladies and gentlemen, I agree with [the state's attorney] on one thing. It comes down to whom do you believe, do you believe [T.B.] or do you believe my client, Doug Moran." By both verdicts, the jury clearly made that determination: it decided to believe T.B. rather than Moran. Because the jury obviously chose to believe T.B.'s version of the events, and because there was sufficient evidence of an aggravated assault apart from the bruises and abrasions caused from the rape, Moran has not established that the jury would have reached a different result had the trial court's instruction not been given. For the same reasons, Moran has not established reversible error.

[¶ 82.] KONENKAMP, Justice, joins this special writing.

SABERS, Justice (concurring in result in part and dissenting in part).

[¶ 83.] I concur in result in part but dissent on Issue 9.

[¶ 84.] **The trial court erred when it instructed the jury that it was supposed to consider the bruises and abrasions caused from the alleged rape in the second charge of aggravated assault.**

[¶ 85.] SDCL 23A–6–23 allows joinder of offenses, and in the instant case, joinder of the aggravated assault and rape charges was appropriate. However, we have stated that joinder of offenses is not prejudicial to the defendant when, "the trial court appropriately instructed the jury to *separately* consider each offense and the evidence applicable thereto." *State v. Busack,* 532 N.W.2d 413, 417 (S.D. 1995) (emphasis supplied). The trial court's answer to the jury's question prejudiced the defendant by ignoring this requirement.

[¶ 86.] As indicated, after hearing argument on this question, the trial court answered in the affirmative with the response: "The answer is yes." A better answer, as suggested by the State, was: Please re-read the instructions. The correct answer was: "No."

[¶ 87.] A "yes" answer allowed the jury to convict Moran on the basis of conduct not charged in the information and tended to preclude the jury from returning a verdict on the lesser-included offense of simple assault. Even more prejudicial was the fact that it instructed the jury to convict on aggravated assault based on bruises and abrasions caused by the alleged rape.

[¶ 88.] The majority opinion's analysis is confusing and incorrect. In paragraph 69, the majority opinion attempts to change the meaning of the jury's question by stating the jury was asking whether it "should consider the bruises from the sex act as they pertained to the aggravated assault charge of the bite on the breast and cigarette burn." The jury's question had nothing whatsoever to do with the "bruises from the sex act as they pertained to the aggravated assault charge of the bite on the breast and cigarette burn." This is simply a concoction of the majority opinion.

[¶ 89.] The question actually asked by the jury was, "[a]re we supposed to consider the bruises and abrasions caused from the 'alleged rape' in the 2nd charge of aggravated assault?" In this context, "supposed to," translates to "should,"

which translates to "shall." By answering "yes," the trial court was not indicating that the jury could consider the bruises and abrasions as evidence on the credibility of the witnesses. Rather, the trial court was telling the jury that it *had to* consider the bruises and abrasions caused by the alleged rape on the aggravated assault charge. The jury was attempting to determine the evidentiary basis of the charge, contrary to the second sentence in paragraph 69 which incorrectly states that the jury, "clearly understood the legal and evidentiary basis between the two charges." Likewise, there is absolutely nothing in the question of the jury that has anything whatsoever to do with credibility. This is another concoction of the majority opinion in an attempt to justify the result.[10] The manner in which the majority opinion skews the meaning of the question is central to its reasoning, but when the question is read as it was written by the jury, the answer and the holding are inappropriate.

[¶ 90.] Furthermore, the majority opinion is inconsistent with itself in that paragraph 58 provides, "... the rape and aggravated assault were *two separate and distinct acts* for which Moran was convicted." (emphasis supplied). The rape and aggravated assault *were* "two separate and distinct acts" and therefore it is obvious that the bruises and abrasions supporting the rape should not also be used to convict on aggravated assault.

[¶ 91.] We should reverse Issue 9 and remand to the trial court to vacate the aggravated assault conviction and the sentence thereon and provide Moran a fair trial on aggravated assault and the lesser-included offense of simple assault.

---

**10.** A review of the trial transcript where this jury question was discussed shows that neither the attorneys nor the court indicated the question had anything to do with the credibility of the witnesses.

Contrary to the assertion in the special concurrence, counsel *did* contemplate that the rape trauma would be used as substantive evidence of the aggravated assault. Specifically, defense counsel objected to a "yes" answer arguing that the charging document did not allege the bruises and abrasions to support the aggravated assault charges. She argued, "I'd say no, Your Honor. First of all, the [charging] information has ... that he burned and bit [her]. There's nothing about any other bruises or abrasions [in the charging information]."

Neither the State's Attorney nor the special concurrence can change the substance and meaning of the jury's question by misinterpreting it to relate to credibility, impeachment, or other non-substantive use.