#30120-a-PJD
**2024 S.D. 71**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

MAXTON PFEIFFER,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JEFFREY R. CONNOLLY
Judge

* * * *

CONOR DUFFY of
Duffy Law Firm
Rapid City, South Dakota                  Attorneys for defendant
                                          and appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
JENNIFER M. JORGENSON
Assistant Attorneys General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.

* * * *

ARGUED
JUNE 5, 2024
OPINION FILED **11/26/24**

#30120

DEVANEY, Justice

[¶1.]        Maxton Pfeiffer shot and killed his friend Ty Scott when Pfeiffer, Scott,

and others were hanging out at their friend Cody Siemonsma's apartment.  Pfeiffer

did not dispute that he swept Siemonsma's .45 caliber pistol in the direction of Scott

and discharged the firearm.  However, he maintained that he checked the pistol

before doing so and believed it to be unloaded.  After a seven-day trial, the jury

found Pfeiffer guilty of first-degree manslaughter.  He appeals, asserting the circuit

court erred by failing to instruct the jury that the State had the burden of proving

criminal intent beyond a reasonable doubt and by refusing to give a mistake of fact

instruction.  He also challenges an evidentiary ruling and the sufficiency of the

evidence to support his conviction.  We affirm.

**Factual and Procedural Background**

[¶2.]        On June 13, 2018, Pfeiffer, who was 18 years old, spent the evening

with his friends at Siemonsma's apartment in Keystone, South Dakota.  This friend

group included Pfeiffer, Siemonsma, Scott, Joshio Villalobos, and Damon Picotte.

Most of them had been friends for a long time and regularly spent time together at

Siemonsma's apartment because he was the only one with a place of his own.  The

apartment was small, consisting of a bathroom and one room comprising the

kitchen, living, and sleeping areas.  That evening, the group was watching YouTube

videos and talking.  Siemonsma and Picotte also "smoked a bowl" of marijuana and

were drinking beer.

[¶3.]        This friend group also liked to shoot guns together recreationally and

when hunting.  A few days prior to June 13, Picotte purchased a .38 revolver, and

he brought it to Siemonsma's apartment to show his friends. Siemonsma also owned five guns, including a Charles Daly model 1911 semi-automatic .45 caliber pistol, which he kept by his bed on either the dresser or nightstand. The .45 caliber pistol was stored in a holster with a full magazine in the handle and a spare magazine in the holster.

[¶4.] Picotte was the first to arrive at Siemonsma's apartment. He testified that while he was showing Siemonsma his .38 revolver, which he claimed was unloaded, either he or Siemonsma picked up Siemonsma's .45 caliber pistol to compare it to the .38 revolver. Picotte further testified that before they compared the two guns, either he or Siemonsma removed the magazine from the .45 caliber pistol and made sure it was unloaded. The two also compared the bullets used for each gun. According to Picotte, after they were done comparing the guns, either he or Siemonsma put the magazine back in the .45 caliber pistol and placed that gun on Siemonsma's dresser. Picotte further testified that as more people, including Pfeiffer, arrived at the apartment, he passed around his .38 revolver for the others to look at. He recalled that at some point, someone "dry fired" his revolver, meaning the trigger was pulled with no bullet in the gun, but he did not remember who dry fired it. He claimed, however, that when the gun was dry fired, it was pointed at either the ground or ceiling.

[¶5.] Pfeiffer similarly recalled everyone looking at Picotte's .38 revolver and that it was dry fired. He testified that at one point after Picotte went outside to smoke a cigarette, Villalobos was "messing around" with the .38 revolver by pointing it at him and Siemonsma. At this time, Pfeiffer and Siemonsma were

sitting on the foot of the bed approximately eight feet from the futon couch where Villalobos was sitting next to Scott. According to Pfeiffer, Villalobos dry fired the .38 revolver while pointing it at them. He further claimed that Siemonsma then took one of his assault rifles, pointed it at Villalobos, and pretended to shoot. To Pfeiffer, they were "joking around." Villalobos testified that he did not "remember doing that" with the .38 revolver and does not remember Siemonsma pointing a rifle at him. Siemonsma testified that he did not point a rifle at anyone.

[¶6.] Pfeiffer testified that as his friends were handling these guns, he decided to join in and picked up Siemonsma's .45 caliber pistol from the dresser. He claimed that he took the pistol out of its holster, removed the loaded magazine from the handle, and "racked" the slide to eject any live rounds. When nothing ejected, he believed that the pistol was unloaded. He testified that he then made a sweeping motion with the pistol in the direction of where Scott and Villalobos were sitting. As he did so, the gun discharged.

[¶7.] Siemonsma testified that he was in the hallway outside his apartment when he heard a gunshot. He claimed he immediately looked into the apartment, saw Pfeiffer make a racking-type gesture with his hands, and heard Pfeiffer shout, "It should have been clear. It should have been clear." Villalobos testified that after he heard the gunshot, he and Scott stood up to check themselves to see if they had been shot. He also heard Pfeiffer say, "I checked. I checked the gun" and saw him make a gesture with his hands as if he was racking the slide of the gun.

[¶8.] Moments after Scott stood to check if he had been shot, he collapsed to the floor. When Villalobos saw blood coming out of Scott's mouth, he yelled, "Call

911." Pfeiffer and Siemonsma ran outside the apartment building to call 911. Both calls were recorded and played for the jury at trial. Siemonsma told the 911 operator to send help because his friend just shot his other friend "on accident." He repeated two other times that it was an accident. At trial, Siemonsma explained that he believed it was an accident "[b]ecause nobody was fighting and nothing was going on." Pfeiffer, who was emotionally distraught and struggling at times to talk during his 911 call, told the operator that he accidentally shot his friend. After receiving instructions from the 911 operator, Pfeiffer returned to the apartment and pressed a towel to Scott's wound until emergency medical personnel arrived.

[¶9.] Two firefighters and two paramedics arrived first on the scene. Keystone Fire Department Chief Cory Jonas testified that when he entered the apartment, he observed three males inside: one person on the floor bleeding, one person standing over him, and another person holding a towel to the wounded person's chest. Chief Jonas asked for the location of the gun and was told it was on the table to the right of the injured person. Chief Jonas did not touch the gun and directed those in the apartment to go outside while the paramedics rendered aid to Scott.

[¶10.] Chief Jonas testified that Highway Patrol Trooper Paige Erickson arrived on the scene while he was assisting the paramedics. Chief Jonas told her to "basically, be our security cover down there and make sure that the gun was secure." Trooper Erickson testified that she understood this as a request to "just empty [the gun] and kind of put it off to the side." She testified that the .45 caliber pistol was on a table by the bed. Although she initially stated that the magazine

was in the pistol, after having her memory refreshed by her written report, she testified that the magazine was lying next to the pistol. She explained how she picked the gun up and looked in the chamber while she "racked the slide," after which she saw "one unspent round eject[] itself" onto the floor. She then picked up the unspent round and placed it on the table next to the pistol after she "locked the slide back" to make it known that "the gun is now empty and safe." She thereafter stood in the doorway of the apartment to ensure no one entered and to await the arrival of additional law enforcement officers.

[¶11.] Park Services Ranger Steven Wollman then arrived on the scene. He testified that "the very first thing [he] noticed when" he entered the apartment was "a very, very, strong odor of burnt marijuana inside the room." After determining that his assistance was not needed inside the apartment, he went outside. He testified that the scene was chaotic; there was "an individual that was on the ground in the grass that was crying and screaming and yelling" and "another individual that was pacing and shouting comments to the individual on the ground." Ranger Wollman testified that he placed these individuals, later identified as Pfeiffer and Picotte, in separate patrol vehicles to de-escalate the chaos at the scene as more people began to congregate.

[¶12.] Pfeiffer was placed in the front seat of Ranger Wollman's vehicle, and the vehicle's audio and video recording system was activated. The recording was entered into evidence at trial. While only approximately 35 minutes of the recording was played for the jury, Ranger Wollman testified that Pfeiffer was "[v]ery distraught and very upset and very emotional" for the entire one hour and

fifty minutes of the recording. Ranger Wollman further testified that he "initiated an interview" with Pfeiffer to determine "[w]hat's going on." Pfeiffer told him that he and his friends were "just sitting there, and they were all holding guns and stuff." He then described the events surrounding the shooting, stating, "And then they were all empty. And then they're pointing them at each other, and then he points one at me [referring to Villalobos], and then they're just joking. They're just sitting there shooting it like a cap gun." Ranger Wollman replied, "Okay," and Pfeiffer continued, "I then I picked one up too and I take out the thing and jack a shell out and nothing came out and I looked in there and didn't see anything in there, so I did a practice shot."

[¶13.] Eventually, Pfeiffer, Villalobos, Picotte, and Siemonsma were transported to the Rapid City Public Safety Building to be interviewed by law enforcement. Deputy Sheriff Kent Pryzmus and Detective Barry Young interviewed Pfeiffer approximately two hours later. The interview was recorded, and the recording was entered into evidence at trial. Pfeiffer told the officers that he believed the .45 caliber pistol was unloaded because he had removed the magazine from the gun, racked back the slide, and no bullet ejected. But he also acknowledged that he did not "get inside and look at it" after nothing came out of the gun when he racked the slide. Pfeiffer then related that he swept the gun toward Villalobos and Scott to mess with them and basically do what Villalobos had done toward him—pointing the gun, firing the gun. He claimed to not remember touching the trigger when he swept the gun, but he stated that "he could have done it."

-6-

[¶14.]     After the interview, Deputy Pryzmus told Pfeiffer that Scott had died.[1] He thereafter placed Pfeiffer under arrest, and on June 28, 2018, a grand jury indicted Pfeiffer on one count of first-degree manslaughter in violation of SDCL 22-16-15(3).  The circuit court held a seven-day jury trial beginning March 7, 2022, during which Siemonsma, Picotte, Villalobos, multiple law enforcement officers, the two paramedics who tended to Scott, a forensic examiner, a forensic firearm and toolmark examiner, and an expert in firearms and firearm functionality testified for the State.  Relevant to this appeal, Siemonsma, Picotte, Villalobos, and the law enforcement officers provided the testimony related above.

[¶15.]     Siemonsma further testified that when the paramedics arrived, they asked him where the gun was located.  He claimed that he went inside the apartment, retrieved the .45 caliber pistol, which was on the table, and showed it to the paramedics.  He further claimed that after they saw it, they told him to put it back, and he did.  He could not recall whether he manipulated the gun in any way. Describing his relationship with Pfeiffer, Siemonsma testified that the two of them "went hunting a lot.  Coyote hunting."  He testified that based on the time he had spent with Pfeiffer shooting guns, he believed Pfeiffer was familiar with guns.

[¶16.]     Regarding the events leading up to Pfeiffer firing the .45 caliber pistol, Siemonsma testified that he did not recall comparing his .45 caliber pistol with Picotte's .38 revolver.  He also did not recall anyone handling the .45 caliber pistol

---

1.     At trial, the expert pathologist testified that the cause of death was a gunshot wound to the chest.  He further testified that the bullet entered Scott's right arm and traveled through his lungs and heart before exiting the left side of his chest and lodging into his left arm.

prior to Pfeiffer and replied "No" to the question whether he had ever, as a joke, pointed a rifle at someone. Siemonsma testified that he did not believe there was anything mechanically wrong with his .45 caliber pistol, and he did not recall any occasions in which it failed to eject a live round or jammed when he tried to unload it.

[¶17.]    Picotte, in contrast, agreed during cross-examination that Siemonsma's .45 caliber pistol had, in the past, failed to eject the live round when the slide was racked back. He explained that he and Siemonsma regularly shot guns together, including Siemonsma's .45 caliber pistol, and that the gun would sometimes fail to eject a live round "because it [the gun] was dirty." He also testified that he previously had a conversation with a third person about how he tried to shoot the .45 caliber pistol "but the round was jammed." He agreed with the statement that "the gun jammed sometimes, and [he] had to cock it back two or three times" when it was dirty.

[¶18.]    Mateo Serfontein, a forensic firearm and toolmark examiner, testified that he was working for the South Dakota Division of Criminal Investigation on the date of the shooting in June 2018 and was assigned to examine the .45 caliber pistol fired by Pfeiffer, the magazines and unfired bullets associated with the .45 caliber pistol that were recovered from the apartment, and the fired bullet removed from Scott's body during the autopsy. Serfontein explained that based on his examination, the .45 caliber pistol did not have any functioning or mechanical issues. He further testified that after confirming that the gun functioned properly, he test-fired it and compared the test-fired bullets to the bullet removed from Scott's

body and determined they were fired from the same .45 caliber pistol. Serfontein further testified that during the test-firing, the .45 caliber pistol ejected properly and loaded through the magazine properly.

[¶19.]     Serfontein also explained how a semi-automatic pistol operates:

> So you would insert the magazine, pull the slide back and release it to feed a round from the magazine into the chamber. Now, when you pull the safety disengage and you pull the trigger, it will discharge that round that's in the chamber. Due to the gasses and the pressure that builds up, it pushes the bullet out of the barrel; it also pushes the slide back. As the slide moves back, it extracts the cartridge case and it hits the ejector which pushes it out of the ejection port.
>
> Now, when the slide moves forward again, after it's been all the way back, it will pick up another cartridge round from the magazine and push it into the chamber, which would make the gun ready to fire again when you pull the trigger. This will continue until the magazine is empty.

When discussing the discharge of a semi-automatic pistol, Serfontein agreed that if the gun had a round in the chamber, the magazine was taken out, and the gun was thereafter fired, it would extract and eject that round. He further explained that under this scenario, because the magazine had been taken out, he would not expect to find another live round in the pistol. However, he agreed with the statement that "if the magazine was in the gun and there were more rounds in the clip, [the gun] would automatically push the round back up in the gun[.]"

[¶20.]     Irving Stone, a firearms expert called by the State, similarly explained how a .45 caliber pistol operates with a loaded magazine. He explained that there are two safeties on the .45 caliber pistol Pfeiffer fired—a grip safety and a thumb safety—that must be disengaged to fire the gun. He further testified that after both safeties are disengaged and the trigger is pulled with at least four and a half

pounds of pressure, the firing pin "hits the primer, which in turn fires the cartridge, and then it comes back, ejects it, and then loads the next [bullet]." According to Stone, a person can manually eject a round without firing it by taking out the magazine and, without putting a finger on the trigger, pulling the slide back to eject the round.

[¶21.] Stone also relayed certain rules of gun safety, including that you "do not point the firearm at anything you do not plan to shoot, period"; always check that the firearm is unloaded; and "keep your finger off the trigger until you're ready to shoot." He testified that to make a .45 caliber pistol "safe," if it were handed to him, "the first thing [he] would do is . . . make sure the magazine was out." He would then "pull the slide back, finger off the trigger, make sure it's pointed in a safe direction, . . . [p]ull the slide back[,]" "[l]ock the slide stop, pin on," and "visually look down in the chamber." Next, he would "take [his] finger and [he] would stick it down in the chamber to make sure there was nothing in there." After this, he would set the gun down "with the slide back so that way anybody that was around or anywhere in the area would know that it was unloaded because you could see that."

[¶22.] Stone further testified that he was asked to examine the .45 caliber pistol fired by Pfeiffer to "see if the firearm was in good functioning, working order, extraction, ejection, safeties, trigger, all of those things were correct and as close to how the factory would have sent the firearm out when they built it." Stone testified that based on his inspection, he did not identify any modifications to the .45 caliber pistol from its factory condition. He also determined that the .45 caliber pistol functioned properly and did not have anything mechanically wrong with it. He

opined that after disassembling the pistol to examine each piece of the firearm, nothing looked out of place and the parts were in good shape. Stone testified that an extremely dirty gun can malfunction, but in his opinion, the cleanliness of the pistol fired by Pfeiffer was not a concern. He explained that the .45 caliber pistol was not "spic and span," but it was not "overly dirty either[.]"

[¶23.]     After reassembling the .45 caliber pistol, Stone conducted extraction tests to ensure the extractor and the ejector were working properly. While running these tests, he handled the .45 caliber pistol in different positions to determine if the gun would extract and eject "in those odd positions." Ultimately, Stone determined that there were no issues with the pistol fired by Pfeiffer and that it would eject live rounds.

[¶24.]     During cross-examination, Stone was asked to explain "bullet-nose binding," a topic that would later be addressed by a firearms expert called by Pfeiffer. Stone testified that bullet-nose binding can occur when a bullet "is being extracted out of the chamber, when it comes back, it hits the ejector and the nose . . . would come out and would - - it could hit and stick against the side of the ejection port and get bound up and then stuck, basically, at an angle." He further testified, however, that throughout his testing of the .45 caliber pistol fired by Pfeiffer, bullet-nose binding did not occur. He generally agreed that in some cases an extended ejector and an ejection port that is not milled to the proper dimensions can make unloading live cartridges from the chamber difficult. However, he opined that the .45 caliber pistol at issue did not have an extended or elongated ejector.

[¶25.]      After the State rested its case, Pfeiffer moved for a judgment of acquittal.  He argued that the State's evidence established only that he acted negligently, not recklessly.  He further asserted that because the evidence established he was not aware the .45 caliber pistol was loaded, the State failed to prove that he was consciously aware of a high risk that the gun would fire a bullet. In response, the State claimed that because Pfeiffer recalled touching the trigger of the gun, "that is enough for the jury to make a conclusion that he had the required general criminal intent to be convicted of this offense."  The circuit court denied Pfeiffer's motion.

[¶26.]      In his defense, Pfeiffer first presented testimony from Dave Lauck, an expert in firearms, particularly the type of .45 caliber pistol at issue here.  Based on his examination of this .45 caliber pistol and the bullet recovered from Scott during the autopsy, Lauck opined that bullet-nose binding occurred when Pfeiffer racked the slide back to eject any bullet that might be in the chamber.  He believed this occurred because the port through which the pistol ejects cartridges had not been modified and elongated as it should have been in light of its extended ejector.  In particular, he explained that the cartridge (bullet and casing) "was trying to eject, but it bound on the front sharp edge of the non-elongated ejection port" and bound "between the ejector and the front leading edge of the ejection port."  He further testified that the type of ammunition used in Siemonsma's .45 caliber pistol contributed to the occurrence of bullet-nose binding because it is the longest .45 caliber cartridge in overall length and thus needs "the most room to get out of the ejection port."

[¶27.]      Lauck confirmed his theory that bullet-nose binding occurred with this .45 caliber pistol based on his observation of a visible "nick" or "scuff mark" near the tip of the bullet removed from Scott during the autopsy. This nick, he testified, supported his theory that the bullet collided with the edge of the ejection port when Pfeiffer racked the slide back. In further support of his theory, Lauck testified that "the lobe of the extractor has firing residue buildup in it" and "that residue will lessen the extractor's grip on the cartridge." Lauck also noticed what he called "brass track evidence over the front of the extractor nose," which he explained indicated to him "that a cartridge dropped into the chamber of this gun before the slide even crossed over the top of it." In his view, "[i]f the gun was operating properly, we would not see that brass track on the nose of this extractor." Another important consideration, according to Lauck, was the position in which Pfeiffer claimed he was holding the gun. Lauck testified that if Pfeiffer was holding the gun sideways as he stated in his interviews and bullet-nose binding occurred, "once the cartridge fell free from the grip of the extractor, gravity would come into effect and literally drop that round right back into the chamber of the gun."

[¶28.]      When asked during cross-examination whether he test-fired the .45 caliber pistol at issue, Lauck stated that he did not do so because he did not want to "alter the evidence unless it was necessary." In his opinion, it was not necessary to test-fire the pistol because, from his examination, "everything was in alignment for the gun to bind." Under further cross-examination, Lauck agreed that Pfeiffer violated specific gun safety rules and that following the safety rules for clearing a gun would have prevented the shooting. He further testified that he personally

would not clear a weapon without sticking his finger in the chamber or without bringing the gun up close for inspection to ensure there is nothing in there.

[¶29.] Lauck also agreed that if a magazine is in a .45 caliber pistol and the slide is racked, the gun will become loaded, and after the trigger is pulled and the bullet leaves the chamber, the gun "will cycle if it's operating properly and kick the empty out and put a new one in the chamber." He then explained that if the magazine is thereafter removed from the gun, the gun would still have a live round in the chamber.

[¶30.] Pfeiffer testified on his own behalf. He stated that although he did not receive any training in the use of firearms, he had experience using both rifles and shotguns for hunting. And while he did not own a semi-automatic pistol, he testified that he "had shot them with friends in the woods[.]" In regard to Siemonsma's .45 caliber pistol, Pfeiffer testified that he had previously fired the gun maybe two or three times while hunting or shooting targets with Siemonsma. He claimed he knew how to take the "clip out" and rack the slide "[t]o eject any bullet that's in the chamber."

[¶31.] Regarding the events on the night Pfeiffer shot Scott, Pfeiffer testified that when Villalobos was handling Picotte's .38 revolver and Siemonsma was holding his assault rifle, no one was upset or responding angrily. He agreed that "everybody thought they were just joking around" and there was no "kind of conflict or attitude or anything [like] that going on[.]" Pfeiffer testified that Scott "was kind of laughing" and "was looking at his phone." Pfeiffer further testified that he then picked up Siemonsma's .45 caliber pistol from the dresser next to the bed, racked

the slide, and "tried to do what the other guys were doing" and "pointed it in their direction and then it fired." He stated he was not "aiming or anything like that." Rather, "it was a sweep." He explained that he believed the pistol was unloaded "[b]ecause [he] took out the magazine and racked the slide and nothing came out." He further explained that he thought he saw seven bullets in the magazine—which holds a total of eight—when he took it out of the gun, and he noticed a live round on the dresser next to the holster and another one on the TV stand. When asked if he intended to pull the trigger, Pfeiffer stated that he thought his fingers were resting outside the trigger guard, but then admitted that he must have touched the trigger. He testified that after the gun discharged, he either put it on the bed or a table.

[¶32.] On cross-examination, Pfeiffer testified that two general rules of gun safety include: "I think you're not supposed to point it in the direction of anybody and treat an empty gun as if it's loaded[.]" When asked whether he followed "those rules on June 13th of 2018," Pfeiffer replied, "No, I did not."

[¶33.] Prior to the defense resting, Pfeiffer's counsel requested, outside the presence of the jury, that the circuit court take judicial notice of a statement a deputy state's attorney had made in a document filed in response to Pfeiffer's April 2021 bond modification motion. In the document, the prosecutor indicated that Pfeiffer shot the gun "in the belief that the gun was not loaded."[2] Pfeiffer argued that this statement was admissible as an admission by a party opponent. The State

---

2. The statement was not made by any of the prosecutors who tried the case a year later.

objected, and the circuit court denied admission of the statement on relevancy grounds and under SDCL 19-19-403.

[¶34.]     During the settling of jury instructions, Pfeiffer requested that the circuit court instruct the jury that the State has the burden of proving criminal intent beyond a reasonable doubt by adding the following language to the instruction identifying the elements that must be proven to convict him of first-degree manslaughter: "In doing the act of the shooting of Ty Robert Scott, the defendant acted with criminal intent."  Alternatively, Pfeiffer requested that the court include additional language in the criminal intent instruction, which refers to a person acting intentionally or recklessly, that the State has the burden of proving that the defendant recklessly killed Ty Scott.  The State objected, asserting that as it relates to the elements instruction, the instruction it proposed properly set forth the statutory elements.  The State also argued that it was unnecessary to include additional language regarding who carries the burden in the criminal intent instruction because the court's instructions as a whole sufficiently inform the jury that the State must prove criminal intent.  The court declined Pfeiffer's requests to add language to the elements or criminal intent instructions, concluding that the court's proposed instructions align with instructions approved by this Court in *State v. Birdshead*, 2015 S.D. 77, 871 N.W.2d 62 and *State v. Mulligan*, 2007 S.D. 67, 736 N.W.2d 808.

[¶35.]     The circuit court also refused to give Pfeiffer's requested instruction defining recklessness and instead instructed the jury in accord with the pattern jury instruction on recklessness.  Finally, the court refused Pfeiffer's requested mistake

of fact defense instruction, reasoning that first-degree manslaughter is not a specific intent crime or the type of general intent crime that would warrant such an instruction.

[¶36.]     After deliberating for over fourteen hours spanning two days, the jury ultimately returned a verdict finding Pfeiffer guilty of first-degree manslaughter. Pfeiffer filed a motion for judgment of acquittal and to set aside the verdict, which the circuit court denied.  The court sentenced Pfeiffer to thirty years in prison with twenty-three years suspended and credit for time served.  Pfeiffer appeals, asserting the following restated issues:

1.     Whether the circuit court properly instructed the jury on the State's burden of proving criminal intent.

2.     Whether the circuit court erred in refusing to give a mistake of fact instruction.

3.     Whether the circuit court abused its discretion in denying admission of a deputy state's attorney's statement in a filing related to pretrial bond.

4.     Whether the evidence is sufficient to sustain Pfeiffer's conviction.

### Analysis and Decision

***1.     Whether the circuit court properly instructed the jury on the State's burden of proving criminal intent.***

[¶37.]     Pfeiffer argues that although the circuit court instructed the jury on criminal intent and on the definition of the words reckless or recklessly, the court's instructions as a whole "were inadequate to give the jury a full statement as to the applicable law because neither instruction made any mention of the State's burden

to prove criminal intent."[3] He further contends that he was prejudiced because "the jury could have reasonably concluded that to convict [him], the State only had the burden of proving the *actus reus* elements" identified in the instruction setting forth the elements of first-degree manslaughter. In so contending, he notes that during closing argument, the State focused particularly on the elements instruction when arguing what the State was required to prove beyond a reasonable doubt.

[¶38.] As this Court recently explained,

> A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard. However, when the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo. Under this de novo standard, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law.

*State v. Black Cloud*, 2023 S.D. 53, ¶ 50, 996 N.W.2d 670, 683 (quoting *State v. Schumacher*, 2021 S.D. 16, ¶ 25, 956 N.W.2d 427, 433–34).

[¶39.] Notably, this is not a case wherein the circuit court failed to instruct the jury on the applicable mens rea. *See, e.g.*, *State v. Jones*, 2011 S.D. 60, 804 N.W.2d 409 (reversing because the circuit court erred in refusing to instruct on a knowing mens rea). On the contrary, Instruction 19 provided:

> In the crime of MANSLAUGHTER IN THE FIRST DEGREE, *the Defendant must have criminal intent*. To constitute criminal intent it is not necessary that there should exist a specific intent

---

3. Pfeiffer suggests the circuit court ruled that "criminal intent was not an element of the crime that the State had the burden to prove." A review of the record does not support this suggestion. While there were multiple discussions concerning whether criminal intent is an *element* such that it should be listed with the instruction listing the statutory elements, the court specifically recognized that the State has the burden of proving criminal intent and that recklessness is the minimum mens rea.

> to violate the law. When a person intentionally or *recklessly* does an act which the law declares to be a crime, the person is acting with criminal intent, even though the person may not know that the conduct is unlawful.

(Emphasis added.) The court further instructed the jury in Instruction 23 that:

> The words "reckless" or "recklessly" (or any derivative thereof) mean a conscious and unjustifiable disregard of a substantial risk that one's conduct may cause a certain result or may be of a certain nature.
>
> A person is reckless with respect to circumstances when a person consciously and unjustifiably disregards a substantial risk that such circumstance exists.

Although neither of these instructions specifically tells the jury that the State must prove criminal intent or recklessness beyond a reasonable doubt, "our precedent clearly indicates that each individual instruction need not apprise the jury of the whole of the law." *See State v. Whistler*, 2014 S.D. 58, ¶ 18, 851 N.W.2d 905, 912. Rather, for jury instructions to be deemed sufficient, they must as a whole "correctly state the law and inform the jury[.]" *State v. Klaudt*, 2009 S.D. 71, ¶ 13, 772 N.W.2d 117, 122 (citation omitted).

[¶40.] Here, the jury was instructed that it must consider the instructions as a whole and "not disregard any instruction, or give special attention to any one instruction[.]" Further, Instruction 14 informed the jury that the State has the burden of proving every element beyond a reasonable doubt and that "[t]he *burden of proof never shifts to the Defendant*, but rests upon the State throughout the trial." (Emphasis added.) Instruction 14 also informed the jury that "[t]he State has the burden of proving the Defendant guilty beyond a reasonable doubt." Additionally, Instruction 33 provided:

> If under the [c]ourt's instructions and evidence you find beyond a reasonable doubt that the Defendant committed the acts constituting the elements of the offense charged, then it is your duty to find the Defendant guilty.
>
> If any member of the jury has any reasonable doubt that the Defendant committed the offense charged, *or any reasonable doubt upon any single fact* or element *necessary to constitute the offense charged* as defined for you by the [c]ourt, then it is that juror's duty to give the Defendant the benefit of the doubt and vote for a verdict of not guilty.

(Emphasis added.)

[¶41.]    From these instructions, as well as Instruction 19 on criminal intent and Instruction 23 defining reckless, the jury was informed that the State retained the burden of proof at all times; the burden of proof is beyond a reasonable doubt; that Pfeiffer cannot be found guilty unless it is shown that he had criminal intent; and that such intent can be found based on proof that Pfeiffer acted recklessly. Taken in totality, these instructions sufficiently apprised the jury that the State had the burden of proving every element and fact necessary to prove the commission of the offense, including mens rea, beyond a reasonable doubt.

[¶42.]    While it would not have been improper for the circuit court to include the additional language requested by Pfeiffer within the intent instruction—that the State has the burden of proving criminal intent beyond a reasonable doubt—it is well settled that a court does not abuse its discretion by denying requested instructions that amplify legal principles already embodied in the court's overall instructions. *State v. Eagle Star*, 1996 S.D. 143, ¶ 13, 558 N.W.2d 70, 73. Further, as this Court has said, a circuit court "has discretion in the wording and

arrangement of its jury instructions[.]" *Black Cloud*, 2023 S.D. 53, ¶ 50, 996 N.W.2d at 683 (citation omitted).

[¶43.] Finally, we note that Pfeiffer's counsel read the court's instruction on criminal intent to the jury during closing argument and argued that the State has to prove criminal intent and that criminal intent must be established beyond a reasonable doubt. The State did not dispute this argument, and in its rebuttal the State acknowledged, "We have to show [Pfeiffer] did an act that was reckless."

[¶44.] We conclude that the circuit court's instructions as a whole correctly stated the law on mens rea and adequately informed the jury of the State's burden in that regard. Therefore, the court did not abuse its discretion in denying Pfeiffer's request to include additional language regarding the State's burden within the instructions at issue.

### 2. Whether the circuit court erred in refusing to give a mistake of fact instruction.

[¶45.] Pfeiffer argues that the circuit court erred in concluding that a mistake of fact instruction was not warranted. In his view, the mistake of fact instruction went to the heart of his defense, and thus, the court's refusal to give such an instruction deprived him of the opportunity to present a complete defense. He notes that "[a] criminal defendant is *entitled* to an instruction on his theory of the case when evidence exists to support his theory." *State v. Charles*, 2001 S.D. 67, ¶ 19, 628 N.W.2d 734, 738 (emphasis added). He then claims that because he presented evidence of his mistaken belief that the gun was unloaded, the jury should have been instructed on his mistake of fact defense. He further argues that he was prejudiced by the circuit court's error because, in his view, there is a reasonable

probability that the jury would have reached a different verdict had he been able to argue the mistake of fact defense "aided by an appropriate mistake of fact instruction."

[¶46.] In response, the State argues that "[f]or a mistake of fact instruction to be given, the evidence in support of that instruction must utterly negate criminal intent." As support, the State cites *State v. Waugh*, wherein this Court said, "[C]onsent may be a defense [to rape] where there is evidence offered and received that the victim did indeed consent; however, that evidence would also have to utterly negate any element of force, coercion, or threat." 2011 S.D. 71, ¶ 25, 805 N.W.2d 480, 486 (alterations in original) (citation omitted). It is true that to preclude a finding of guilt, an alleged mistake of fact, if believed by the jury, must be one that would negate the existence of the requisite mens rea. *See United States v. Iron Eyes*, 367 F.3d 781, 784, 785 (8th Cir. 2004) (noting that "[t]he applicable principle is that if a defendant reasonably though mistakenly believes facts that negate the mental state necessary for conviction of the offense with which he or she has been charged, the crime simply has not been committed"); *see also* SDCL 22-3-1(3). However, *Waugh* did not involve a mistake of fact defense or its relationship to a requisite mens rea. Rather, it involved whether and when a consent defense is appropriate in a rape case to rebut the element of force or coercion.

[¶47.] This Court, in *Charles*, considered the interplay between a mistake of fact defense and the State's burden to prove a particular mens rea. 2001 S.D. 67, 628 N.W.2d 734. The case involved a defendant who shot and killed his stepfather with a rifle and was charged with first-degree murder, second-degree murder, and

first-degree manslaughter. As Pfeiffer did here, Charles claimed that he did not know the rifle was loaded and he requested a mistake of fact instruction. The circuit court refused to give the instruction, and on appeal, this Court affirmed. We recognized that a defendant is entitled to an instruction on a defense theory that is supported by evidence. *Id.* ¶ 19, 628 N.W.2d at 738. However, we noted that "it is not error for a court to refuse to amplify principles embodied in given instructions." *Id.* (citing *State v. Walton*, 1999 S.D. 80, ¶ 13, 600 N.W.2d 524, 528). We further noted that to obtain reversal, the defendant must show prejudice from the circuit court's refusal to give a requested instruction. *Id.*; *see Walton*, 1999 S.D. 80, ¶ 12, 600 N.W.2d at 528.

[¶48.] We therefore reviewed the jury instructions as a whole and concluded that the defendant "failed to show any error by the trial court in refusing to give his proposed mistake of fact instruction." *Id.* ¶ 20. Central to our holding was our recognition, as noted in past cases, that "whenever an intent instruction involving the defendant's mental state is given, the *mistake of fact concept is automatically included and does not merit a separate instruction*." *Id.* (quoting *State v. Johnston*, 478 N.W.2d 281, 283 (S.D. 1991)); *see also State v. Jensen*, 2007 S.D. 76, ¶¶ 20–22, 737 N.W.2d 285, 291 (upholding denial of mistake of fact instruction as cumulative to the instructions given to the jury on charge of misuse or alteration of a brand); *State v. Toben*, 2014 S.D. 3, ¶ 21, 842 N.W.2d 647, 653 (concluding that although a mistake of fact instruction may have assisted the jury on the question whether the State proved the element of knowledge, the jury was adequately instructed on the knowledge element, and therefore, the circuit court did not commit plain error by

not sua sponte instructing on "a defense that serves only to negate the mental state element of the charged offense").[4]

[¶49.] So too here, a review of the circuit court's instructions as a whole reveals the jury was correctly and fully instructed on the applicable law. As in *Charles*, the circuit court adequately instructed the jury on the elements of the offense and the applicable mens rea. *See* 2001 S.D. 67, ¶ 20, 628 N.W.2d at 738. In particular, the court's instructions informed the jury that the State was required to prove beyond a reasonable doubt that Pfeiffer caused the death of Scott; the killing was by means of a dangerous weapon; that Pfeiffer did so without any design to effect Scott's death; and Pfeiffer acted recklessly, i.e., with "a conscious and unjustifiable disregard of a substantial risk that one's conduct may cause a certain result or may be of a certain nature," or was "reckless with respect to circumstances" because he "consciously and unjustifiably disregard[ed] a substantial risk that such circumstance exist[ed]."

---

4. As explained above, although a mistake of fact instruction may be unnecessary when the jury instructions in their totality properly set forth the applicable law, if one is given, we caution that the pattern instruction on a mistake of fact may not be a one-size-fits-all instruction. A question whether a defendant's conduct is reckless is a bit more nuanced than a question whether a defendant charged with a crime requiring a knowing act did or did not *know* a particular *fact*, or in the case of a specific intent crime, whether a defendant did or did not act with the specified *intent*. Recklessness is instead assessed by whether there was a *conscious and unjustifiable disregard* of a substantial *risk*. Thus, when evaluating whether alleged conduct was reckless, particularly when considering charges involving the use of high-risk weapons like firearms, not all mistakes of fact, even when reasonable, will necessarily negate a determination that there was a conscious and unjustifiable disregard of a substantial risk.

[¶50.]     Further, because the evidence of Pfeiffer's mistaken belief related to whether the State failed to prove criminal intent, the circuit court's instructions as to the required mental state—along with its instruction that if any juror has a reasonable doubt as to any fact or element necessary to prove the offense, it is that juror's duty to vote not guilty—adequately allowed Pfeiffer to present and argue his mistake of fact defense.[5]  Finally, although the court refused to give a separate mistake of fact instruction, Pfeiffer presented his mistake of fact evidence to the jury and argued that because of his mistaken belief that the gun was unloaded, the State could not prove that he acted recklessly.  Therefore, the lack of such instruction did not preclude Pfeiffer from presenting and arguing this defense to the jury.  We conclude the circuit court did not abuse its discretion in refusing to give a mistake of fact instruction.

### 3.     Whether the circuit court abused its discretion in denying admission of a deputy state's attorney's statement in a filing related to pretrial bond.

[¶51.]     While awaiting trial, Pfeiffer filed a motion to have his bond conditions amended, and the State objected.  In its written argument in support of its objection, the State, via a deputy state's attorney, stated that "Defendant killed Ty

---

5.     As noted by a secondary source, a mistake of fact defense is different than affirmative defenses such as self-defense and "is sometimes referred to as a 'failure of proof' defense because it is an attempt by the defense to suggest to the factfinder that the prosecution failed in its burden to establish beyond a reasonable doubt that the defendant acted with the required mental state for the offense.  In that sense, the defense is almost 'unnecessary' in the sense that it merely restates the prosecution's burden to establish with evidence each material element includ[ing] any required mental element, beyond a reasonable doubt."  1 Wharton's Criminal Law § 13:2, *Mistake of Fact* (16th ed. 2024).

by recklessly handling a firearm, pointing it directly at Ty and pulling the trigger, in the belief that the gun was not loaded." Pfeiffer filed a pretrial motion requesting that the court allow admission of this statement at trial as a non-hearsay admission of a party opponent under SDCL 19-19-801(d). The State objected, asserting among other arguments that such statement is not admissible, and even if it is admissible, it would only serve to confuse the jury. The circuit court determined that it would consider the admissibility of this statement at trial.

[¶52.] At the conclusion of the trial, but before Pfeiffer rested his case, he asked the circuit court to take judicial notice and allow admission of the deputy state's attorney's statement based on the same arguments he previously advanced. The State once again objected, noting that the statement was made to reflect what Pfeiffer had told law enforcement. The State also asserted that because this statement was made in a pretrial bond hearing, it is not relevant and, even if relevant, it should be excluded under SDCL 19-19-403 because there is "an extreme danger that the jury will confuse the issues and the burden." The court denied admission of the statement because it was not being offered *against* the State given that the State did not present contrary evidence that Pfeiffer believed the gun was loaded. The court alternatively ruled that the statement should be excluded under SDCL 19-19-403.

[¶53.] On appeal, Pfeiffer contends that in denying admission of the statement, the circuit court erroneously ruled that "Pfeiffer's state of mind was not at issue in the trial." He further argues that the court abused its discretion in denying admission of the statement because "it was directly probative of Pfeiffer's

lack of awareness of a substantial risk and went to disprove the State's burden to prove that he acted with reckless criminal intent."

[¶54.] "This Court reviews a decision to admit or deny evidence under the abuse of discretion standard." *State v. Stanley*, 2017 S.D. 32, ¶ 21, 896 N.W.2d 669, 677. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Caffee*, 2023 S.D. 51, ¶ 26, 996 N.W.2d 351, 360.

[¶55.] Contrary to Pfeiffer's view, the circuit court did not rule that his mental state is *not* an issue at trial. Rather, the court stated,

> I'm not sure it's being offered against the opposing party, because ultimately here at trial, the State didn't present really any evidence to say that the defendant believed the gun was loaded at the time. . . . More importantly, I think it's . . . it's not relevant. . . . [J]ust because a State's Attorney said something at some point, and just because they're a party opponent, doesn't mean that all - - everything the prosecutor has said in a brief and in an oral argument along the way then suddenly comes in just because it's about the same subject matter. . . . Certainly his [s]tate of mind and - - might be relevant here, but the State's position or understanding of what she asserted in that context is not relevant[.]

[¶56.] Pfeiffer has not established that the circuit court abused its discretion in denying admission of the deputy state's attorney's statement. The relevance of this statement made with respect to a bond hearing held a year prior to trial is minimal, given the absence of any contrary argument or evidence presented by the State at trial suggesting that Pfeiffer believed the gun was loaded. *See* SDCL 19-19-401 (relevant evidence "has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action"). For this same reason, the statement does not squarely fit under the

category of non-hearsay statements as defined under SDCL 19-19-801(d) which are "offered *against* an opposing party." (Emphasis added.) Also, because the deputy state's attorney could not have personal knowledge of what Pfeiffer believed, it is apparent that the statement was simply relating what *Pfeiffer* had reported to law enforcement. Finally, the circuit court appropriately concluded that the statement was excludable under SDCL 19-19-403 because the dangers of unfair prejudice, confusion of the issues before the jury, undue delay, or waste of time substantially outweighed any probative value. We conclude that the circuit court did not abuse its discretion in denying admission of this statement.

### 4. Whether the evidence is sufficient to sustain Pfeiffer's conviction.

[¶57.]     Pfeiffer argues that the State failed to present sufficient evidence to sustain a finding beyond a reasonable doubt that he "intentionally or recklessly [did] an act which the law declares to be a crime[.]" In his view, the State's evidence established only that he failed "to conform his conduct to basic gun safety rules," which he asserts is at most negligent conduct, not reckless. He further asserts that "[b]ecause it was undisputed by the State that Pfeiffer believed the gun was not loaded, no reasonable jury could have found beyond a reasonable doubt that Pfeiffer had consciously disregarded a substantial risk[.]"

[¶58.]     "A question regarding the sufficiency of the evidence to sustain a conviction is reviewed de novo." *State v. McReynolds*, 2020 S.D. 65, ¶ 11, 951 N.W.2d 809, 814. "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *State v. Peneaux*, 2023 S.D. 15, ¶ 24, 988 N.W.2d 263, 269

(quoting *State v. Frias*, 2021 S.D. 26, ¶ 21, 959 N.W.2d 62, 68). "If the evidence,

including circumstantial evidence and reasonable inferences drawn therefrom[,]

sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *State v.*

*Podzimek*, 2019 S.D. 43, ¶ 30, 932 N.W.2d 141, 149 (citation omitted).

[¶59.]        Under SDCL 22-16-15(3), "[h]omicide is manslaughter in the first

degree if perpetrated: . . . [w]ithout any design to effect death, including an unborn

child, but by means of a dangerous weapon[.]" Further, to sustain the finding of

guilt here, the evidence must establish that Pfeiffer acted with criminal intent,

namely that he acted recklessly. Under SDCL 22-1-2(1)(d) and the circuit court's

instruction, "[t]he words, 'reckless, recklessly,' and all derivatives thereof, import a

conscious and unjustifiable disregard of a substantial risk that the offender's

conduct may cause a certain result or may be of a certain nature. A person is

reckless with respect to circumstances if that person consciously and unjustifiably

disregards a substantial risk that such circumstances may exist[.]"

[¶60.]        Here, although the State did not dispute that Pfeiffer believed the gun

was unloaded, Pfeiffer's belief in that regard did not foreclose the jury from finding

that he was reckless. Rather, evidence of his belief was just one fact among all

evidence presented at trial that the jury considered when determining that Pfeiffer

acted with a conscious and unjustifiable disregard of a substantial risk that his

conduct may cause a certain result or may be of a certain nature. As this Court has

explained, "[t]he key question to determine whether conduct is reckless or negligent

'depends upon [one's] awareness of the risk [one's] behavior creates'" and whether

the person consciously disregarded a substantial risk. *McReynolds*, 2020 S.D. 65, ¶ 14, 951 N.W.2d at 814–15 (citation omitted). Further, "[a]lthough it is not always possible for the State to directly establish that a defendant was aware of a risk, it can be done indirectly through the defendant's conduct." *Id.* (citation omitted).

[¶61.] As it pertains to Pfeiffer's awareness and whether he consciously and unjustifiably disregarded a substantial risk, the State presented evidence that Pfeiffer had knowledge of firearms, including semi-automatic guns, and knowledge of gun safety rules, including that one is to "treat an empty gun as if it's loaded" and never point a firearm, loaded or unloaded, at a person. The obvious rationale underpinning these and other gun safety rules identified by the experts at trial is the risk of death that could occur if such rules are not followed. By his own admission, Pfeiffer nevertheless swept the gun in the direction of Scott and Villalobos and took "a practice shot." Given Pfeiffer's admitted knowledge of gun safety rules, the jury could have concluded that such actions constituted a conscious and unjustifiable disregard of a substantial risk, regardless of Pfeiffer's mistaken belief that the gun was unloaded.

[¶62.] The jury also heard Pfeiffer admit that, although he racked the slide and did not see a round eject, he did not look inside the chamber to confirm the pistol was unloaded. Further, although Pfeiffer maintained that he removed the magazine prior to racking the slide, the jury may have concluded otherwise based on the evidence that a live round ejected from the .45 caliber pistol when Trooper Erickson, who was the first law enforcement officer to handle the pistol after the shooting, picked up the gun and racked the slide. Importantly, consistent with the

testimony from all the experts, including Pfeiffer's, the most plausible explanation for why a live round would be in the chamber *after* the shooting was that the magazine was still in the pistol when it was fired, an action that would have automatically reloaded a live round into the chamber.[6]  Thus, if the jurors believed that the magazine was in the pistol at the time Pfieffer racked the slide back to see whether it was loaded, they could have concluded that he unintentionally, but recklessly, loaded a bullet into the chamber when he released the slide.  *See* 1 Wharton's Criminal Law § 13:2, *Mistake of Fact* (16th ed. 2024) (noting that "a jury could convict an individual of reckless manslaughter for their reckless mistake of thinking a gun was unloaded when they pointed it at someone and pulled the trigger").

[¶63.]       Under this Court's standard of review, "it is the function of the jury in resolving factual conflicts, to weigh the credibility of those who testify, and ascertain the truth."  *State v. Janklow*, 2005 S.D. 25, ¶ 22, 693 N.W.2d 685, 695 (quoting *Moran*, 2003 S.D. 14, ¶ 36, 657 N.W.2d at 328).  Based on our review of the evidence in a light most favorable to the prosecution, we conclude that the evidence is sufficient to sustain Pfeiffer's conviction of first-degree manslaughter.

[¶64.]       Affirmed.

[¶65.]       JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.

---

6.     The experts testified that if the magazine was not in the pistol when Pfeiffer shot Scott, the only other way a live round would have thereafter been found in the chamber was if someone had manually inserted another bullet in the gun after the shooting.  There was no evidence at trial that such occurred.